# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MARY BISHOP and SHARON BALDWIN,** | ) | |
| **individuals; SUSAN G. BARTON and GAY** | ) | |
| **E. PHILLIPS, individuals.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 04-CV-848-TCK-SAJ** |
| | ) | |
| **The STATE OF OKLAHOMA, ex rel. DREW** | ) | |
| **EDMONDSON, in his official capacity as** | ) | |
| **Attorney General of the State of Oklahoma and** | ) | |
| **BRAD HENRY in his official capacity as** | ) | |
| **Governor of the State of Oklahoma;** | ) | |
| **the UNITED STATES OF AMERICA, ex rel.** | ) | |
| **JOHN ASHCROFT, in his official capacity** | ) | |
| **as Attorney General of the United States of** | ) | |
| **America, GEORGE W. BUSH, in his official** | ) | |
| **capacity as President of the United States.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED OPINION AND ORDER[*]

Before the Court are the Motion to Dismiss of Defendant the State of Oklahoma, ex rel.

Drew Edmondson, in his official capacity as Attorney General of the State of Oklahoma and Brad

Henry, in his official capacity as Governor of the State of Oklahoma (the "State Defendants")

(Docket No. 7); the Motion to Dismiss of the United States of America, ex rel. John Ashcroft, in his

official capacity as Attorney General of the United States of America and George W. Bush, in his

official capacity as President of the United States (the "Federal Defendants") (Docket No. 15); the

---

[*]This Amended Opinion and Order corrects pages 25-29 of the Opinion and Order dated
July 20, 2006, in which the Court erroneously referred to Part A of the Oklahoma Amendment as
Part B of the Oklahoma Amendment.  This Amended Opinion supersedes the July 20, 2006
Opinion and Order, and the same (Docket No. 90) is vacated.

Honorable Thad Balkman and Oklahomans For Protection of Marriage Inc.'s Motion to Intervene (Docket No. 4); and Plaintiffs' Motion to Strike (Docket No. 33).

I.     Background

Plaintiffs Mary Bishop and Sharon Baldwin ("Bishop and Baldwin") are a lesbian couple in a committed relationship who reside in the Northern District of Oklahoma.  They exchanged vows in a church-recognized commitment ceremony in March of 2002 but desire to be civilly married in Oklahoma.  Plaintiffs Susan Barton and Gay Phillips ("Barton and Phillips") are a lesbian couple who were joined in a civil union conducted in the State of Vermont on August 4, 2001, and who were legally married in Vancouver, British Columbia, Canada, on May 16, 2005.[2]  Barton and Phillips reside in the Northern District of Oklahoma and desire to have their Vermont civil union and/or Canadian marriage recognized in the State of Oklahoma.  Both couples are referred to collectively as Plaintiffs.

In their Complaint, Plaintiffs seek declaratory and injunctive relief that the Defense of Marriage Act ("DOMA"), codified at 1 U.S.C. § 7 and 28 U.S.C. § 1738C, and Article 2, § 35 of the Oklahoma Constitution (the "Oklahoma Amendment"), violate the United States Constitution. Specifically, Plaintiffs allege that DOMA and the Oklahoma Amendment violate the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Full Faith and Credit Clause, and the Privileges and Immunities Clause.  The Federal Defendants are the federal officials charged with enforcement and execution of DOMA, and the State

---

[2]  The fact that Barton and Phillips were legally married in Canada was asserted in Plaintiffs' Supplement of Facts and Law (Docket No. 71), which was submitted after the briefing on the Motions to Dismiss before the Court.  The Federal Defendants did not address or dispute this fact in their Response to Plaintiffs' Supplement of Facts and Law (Docket No. 82).

Defendants are the state officials charged with enforcement and execution of the Oklahoma Amendment. The Federal Defendants and State Defendants have filed separate motions to dismiss.

II.    Motion to Dismiss Standard

For a motion made under FED. R. CIV. P. 12(b)(6) to succeed, a defendant must show that, as a matter of law, the plaintiff has failed to state a claim upon which relief can be granted. It must appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In evaluating a motion to dismiss, a court must accept all well-pled allegations as true and indulge all reasonable references in favor of plaintiff. *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997); *Weatherford v. Globe Int'l, Inc.*, 832 F.2d 1226, 1228 (10th Cir. 1987).

III.   DOMA - Federal Defendants' Motion to Dismiss

DOMA, which became law in 1996, contains two substantive sections. *See* Pub. L. No. 104-199, 100 Stat. 2419 (1996). Section 2 of DOMA ("Section 2") is entitled "Powers Reserved to the States" and is codified at 28 U.S.C. § 1738C. Section 2 provides that no State "shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State." 28 U.S.C. § 1738C. Section 3 of DOMA ("Section 3") is entitled "Definition of Marriage" and is codified at 1 U.S.C. § 7. Section 3 provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or wife.

1 U.S.C. § 7. Plaintiffs challenge the constitutionality of both sections of DOMA.

A.      *Standing - General Principles*

Federal jurisdiction is limited to actual cases and controversies.  U.S. CONST. art. III, § 2, cl.1.   The case and controversy requirement involves an analysis of whether a plaintiff has "standing" to bring her claim.   "The standing requirement is born partly of an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (internal quotation marks omitted). There are three requirements to constitutional standing:

> "First, the plaintiff must have suffered an 'injury in fact'- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 821 (10th Cir. 1999) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).   "The party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific facts which prove standing."  *Id.*  With respect to the pleading requirements for standing at the motion to dismiss stage, the Supreme Court explained:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

4

*Lujan*, 504 U.S. at 561 (internal citations omitted).

In addition to constitutional standing requirements, a court must also consider "prudential" standing principles. *See Board of County Comm'rs of Sweetwater County v. Geringer*, 197 F.3d 1108, 1112 (10th Cir. 2002). "Under a prudential standing inquiry, a party that has satisfied the requirements of constitutional standing may nonetheless be barred from invoking a federal court's jurisdiction." *Id.* Prudential standing has three conditions a party must overcome before invoking federal court jurisdiction. First, a plaintiff must assert his own rights, rather than rights belonging to third parties. Second, a plaintiff's claim must not be a "generalized grievance" shared in substantially equal measure by all or a large class of citizens. Third, the grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee involved in the suit. *See id.*

### B.   Standing to Challenge Section 2

The Federal Defendants argue that Plaintiffs Bishop and Baldwin lack standing to challenge Section 2 because they have never entered into a marriage or other formal union in another state and therefore Section 2 could have no cognizable effect on them. Bishop and Baldwin conceded this point in their response brief. Therefore, Section 2 is challenged only by Plaintiffs Barton and Phillips.

The Federal Defendants have not raised the issue of whether Barton and Phillips have standing to challenge Section 2. Regardless, the issue of standing must be addressed by the Court as an initial matter. *See Smelt v. County of Orange*, 447 F.3d 673, 682 (9th Cir. 2006) (noting that court must address standing even if not raised by the parties). It is undisputed that Plaintiffs Barton and Phillips were joined in a civil union in the State of Vermont and were legally married in Canada.

Each legal relationship will be addressed separately for purposes of their standing to challenge Section 2.

> 1.    Vermont Civil Union

Section 2 recognizes that States are not required to give effect to a "public act, record, or judicial proceeding . . . of [another] State. . . respecting a relationship between persons of the same sex *that is treated as a marriage* under the laws of such other State."  *See* 28 U.S.C. § 1738C (emphasis added).  Barton and Phillips have not obtained a marriage license from another state in the United States.[3]  Instead, they have entered into a "civil union" under the laws of Vermont.  This leads to the question of whether a Vermont civil union qualifies as a "public act, record, or judicial proceeding" that is "treated as a marriage" under Vermont law.  If so, Plaintiffs have suffered a concrete injury because Section 2 prevents, or at least arguably prevents, them from obtaining a marriage license in Oklahoma.[4]  If not, Plaintiffs lack standing to challenge Section 2 of DOMA because Section 2 does not impact Oklahoma's recognition or non-recognition of their Vermont civil

---

[3]  Currently, Massachusetts is the only state in the union that grants marriage licenses to same-sex couples.  Some scholars have stated or implied that an actual marriage, rather than any other form of same-sex legal relationship or union, is required in order for a plaintiff to have standing to challenge DOMA.  *See, e.g.,* Mark P. Strasser, *"Defending" Marriage in Light of the Moreno-Cleburne-Lawrence Jurisprudence*, 38 CREIGHTON L. REV. 421, 436-37 (2005) (stating that "it is not clear that anyone had standing to challenge [DOMA] before Massachusetts recognized same-sex marriages"); Joanna L. Grossman*, Resurrecting Comity:  Revisiting the Problem of Non-Uniform Marriage*, 84 OREGON LAW R. 433 n.128 ("Until Massachusetts began to permit same-sex couples to marry, no one had standing to challenge DOMA.").

[4]  The Court uses the word "arguably" because it is debatable whether states would have been required under the Full Faith and Credit Clause or any other law to give effect to same-sex marriages or civil unions entered in other states.  *See* Patrick Borchers, *The Essential Irrelevance of the Full Faith and Credit Clause to the Same-Sex Marriage Debate*, 38 CREIGHTON LAW R. 353, 358 (2005) (arguing that DOMA was unnecessary because it "simply states what the law would be without it" because "full faith and credit principles do not require one state to give effect to a marriage celebrated in another state").

union.

In 1999, the Supreme Court of Vermont ruled that the denial of benefits to same-sex couples was a violation of the Vermont Constitution and directed the Vermont Legislature to adopt a domestic partnership statute or grant the right to marry to same-sex couples. *See Baker v. Vermont*, 744 A.2d 864, 866 (Vt. 1999). The Vermont Legislature responded by creating a new legal creature known as a "civil union." The statute provides:

> (1) "Certificate of civil union" means a document that certifies that the persons named on the certificate have established a civil union in this state in compliance with this chapter and 18 V.S.A. chapter 106.
> (2) "Civil union" means that two eligible persons have established a relationship pursuant to this chapter, and may receive the benefits and protections and be subject to the responsibilities of spouses.
> . . .
> (4) "Marriage" means the legally recognized union of one man and one woman.
> (5) "Party to a civil union" means a person who has established a civil union pursuant to this chapter and 18 V.S.A. chapter 106.

VT. STAT. ANN. tit. 15, § 1201. In order to qualify for a civil union, a person must not be a party to another civil union or a marriage. *See id.* § 1202. Further, the couple must be of the same sex and therefore *excluded* from the marriage laws of Vermont. *See id.* Parties to a civil union "have all the same benefits, protections and responsibilities under law, whether they derive from statute, administrative or court rule, policy, common law or any other source of civil law, as are granted to spouses in a marriage." *Id.* § 1204. According to one commentator, Vermont "created a new type of quasi-marriage that granted to same-sex couples entering a civil union all the benefits of marriage granted by state law to any other Vermont married couple." *See* Lewis A. Silverman, *Vermont Civil Unions, Full Faith and Credit, and Marital Status*, 89 KY. L.J. 1075, 1079 (2001) [hereinafter "Silverman"]. Unlike domestic partnerships that had been established by other states, the Vermont civil union was meant to be an "official form of recognition granted to same-sex couples in a manner

similar to that granted to married couples." *Id.* at 1080-81.  A civil union "cannot be terminated unless dissolved in a manner virtually identical to a civil divorce for married couples."  *Id.*  Thus, for purposes of legal benefits and responsibilities, the Vermont civil union is in many ways "treated as a marriage."

At the same time, it is clear that a Vermont civil union is not the equivalent of a marriage. The Vermont Legislature chose to create a "hybrid creature" that is something less than the full-scale legal marriage that is granted to opposite-sex couples.  The legislature expressly clarified, in the civil union statute itself, that "marriage" was limited to one man and one woman.  VT. STAT. ANN. tit. 15, § 1201(4).  The legislative findings accompanying the Vermont statute noted that "'a system of civil unions does not bestow the status of civil marriage.'"  *See Burns v. Burns*, 560 S.E.2d 47, 48 (Ga. App. 2002) (holding that a Vermont civil union is not the equivalent of a marriage) (quoting 2000 Vt. Act 91, § 1(10)); *see also* Silverman, *supra*, at 1100-01 ("[B]y definition, a Vermont civil union is not a marriage. . . .  [B]ecause the law limits the concept of the civil union to something less than marriage, couples who invoke the solemnization rituals of the Civil Union Law do not achieve the full title and status of marriage.").  Therefore, in certain regards, the Vermont civil union is not "treated as a marriage."

Because of the standing problems that DOMA presents, there is little jurisprudence to guide the Court's decision.  The only helpful precedent found arose in a federal district court in California. In *Smelt v. County of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005) ("*Smelt I*"), the court concluded that  same-sex plaintiffs who had obtained a California "domestic partnership" lacked standing to challenge Section 2 of DOMA because a California domestic partnership was not "treated as a marriage" under California law.  In *Smelt v. County of Orange*, 447 F.3d 673, 683 (9th Cir. 2006)

8

("*Smelt II*"), the Ninth Circuit affirmed this decision regarding Section 2, although arguably on slightly different grounds. Instead of discussing whether and to what extent a domestic partnership was "*treated* as a marriage," the Ninth Circuit reasoned that the plaintiffs did not have standing because "[n]o state has determined that [they] are married." *Id.* The court reasoned that "while Section 2 may affect someone who has been declared married in some state, [plaintiffs] do not come within that category of people." *Id.*

The Court concludes that Plaintiffs Barton and Phillips lack standing to challenge Section 2 because their Vermont civil union is not "treated as a marriage" under Vermont law, as that term was meant to be understood when Congress passed DOMA. The Court agrees with the commentator who stated:

> DOMA did not anticipate the scenario of an alternate form of legally-cognizable relationship. It specifically limits its application to a "relationship between persons of the same sex that is treated as a marriage"; a civil union, however, is not treated as a marriage. The attempt to implicate the Defense of Marriage Act in determining the effect of a civil union should therefore fail. The statute by its own words does not apply, and, therefore, no DOMA challenge should arise under the Civil Union Law.

Silverman, *supra*, at 1102. Instead, a civil union is its own creature that is offered only to same-sex individuals and that is distinct from full-scale legal marriages. Further, the only existing circuit precedent addressing standing to challenge Section 2 of DOMA, the *Smelt II* decision, indicates that the Section 2 standing analysis is, in fact, limited to the question of whether a plaintiff has actually been "married" in another state. *See Smelt II*, 447 F.3d at 683. In this case, Vermont has not determined that Barton and Phillips are legally married; it has only determined that they are entitled to the legal benefits of marriage by virtue of a civil union. Accordingly, although it presents a more difficult question than the standing of a couple that has merely obtained a domestic partnership, the Court concludes that Plaintiffs Barton and Phillips lack standing to challenge Section 2.

2.	Canadian Marriage

In addition to obtaining a Vermont civil union, Barton and Phillips were also legally married in Vancouver, British Columbia, Canada, on May 16, 2005.  In 2003, Canada became the third country to allow gays and lesbians to marry, after a court in British Columbia ruled that the common-law ban on same-sex marriage violated the equality rights of gays and lesbians under the Canadian Charter of Rights and Freedoms.  *See* Deborah Gutierrez, *Gay Marriage in Canada: Strategies of the Gay Liberation Movements and the Implications It Will Have on the United States*, 10 NEW ENG. J. INT'L & COMP. L. 175, 201(2004) [hereinafter "Gutierrez"].  Unlike the Vermont civil union, a Canadian marriage involves an actual "marriage," issuance of a "marriage license," and there can be no doubt that Plaintiffs' legal relationship is "treated as a marriage" in Canada.  *See id.* at 200-08.  The issue, instead, is whether Section 2 has any effect on the recognition of a Canadian marriage since Canada may not qualify as another "State," as that term is used in Section 2.

Section 2 was passed pursuant to the Full Faith and Credit Clause.  *See* H.R. Rep. No. 104-664, at 25-26 (1996), reprinted in 1996 U.S.C.C.A.N. 2905, 2929-30 ("[T]his situation presents an appropriate occasion for invoking our congressional authority under the second sentence of the Full Faith and Credit Clause to enact legislation to prescribe what (if any) effect shall be given by the States to the public acts, records, or proceedings of other States relating to homosexual marriage.").  The Full Faith and Credit Clause applies only to "states" within the United States and does not mandate that a state give full faith and credit to a public act, record, or judicial proceeding of a foreign country.  *See* Mark Wojcik, *The Wedding Bells Heard Around the World:  Years From Now, Will We Wonder Why We Worried About Same-Sex Marriage?*, 24 N. Ill. U. L. Rev. 589, 646

10

(2004) ("Although the word "State" may be understood in public international law to mean another country or nation, the context of word "State" as used in the Full Faith and Credit Clause of the U.S. Constitution is limited to other states of the United States.").  Instead, only principles of  "comity" are relevant in determining what effect a state in the United States will give to a foreign marriage, and it is a discretionary decision of the forum state as to whether a Canadian marriage will be recognized.  *See id.* (explaining that the Full Faith and Credit Clause would not mandate recognition of a Canadian marriage but Canadian same-sex marriages could be granted legal recognition as a matter of comity, which is a "legal principle of accommodation that invokes 'neighborliness' and 'mutual respect' of one country for the other"); Gutierrez, *supra*, at 214 ("[B]ecause recognizing foreign law under comity is not a binding obligation, but merely a discretionary decision, recognizing same-sex marriages from Canada will be difficult, and will depend largely on where each claim is filed.").  Because Section 2 aims to relieve states of any potential obligation to comply with the Full Faith and Credit Clause, because Section 2 tracks the language of the Full Faith and Credit Clause, and because Section 2 was passed pursuant to Congress' authority under the Full Faith and Credit Clause, the Court concludes that use of the word "State" in Section 2 of DOMA (like use of the word "State" in the Full Faith and Credit Clause) was not intended to include foreign countries but instead was intended only to include states within the United States.  Accordingly, Plaintiffs Barton and Phillips' Canadian marriage is also insufficient to provide standing for a challenge to Section 2.

> C.      *Standing to Challenge Section 3*

The Federal Defendants have not raised the issue of whether any of the four Plaintiffs have standing to challenge Section 3, the definitional provision of DOMA.  Nonetheless, the Court finds

this issue should also be addressed as an initial matter.

Plaintiffs Bishop and Baldwin have not entered into any type of legal union or relationship that could potentially entitle them to federal benefits, even if the federal definition of marriage extended to same-sex unions, and therefore Congress is not refusing to recognize their legal "status" in any way.  In the Ninth Circuit's decision in *Smelt II*, cited above, the court concluded that the couple that had entered into a California domestic partnership also lacked standing to challenge Section 3 of DOMA for the following reasons:

> We, therefore, do not see how they can claim standing to object to Congress's definition of marriage for federal statutory and regulatory purposes. It certainly is not a question of Congress's refusal to recognize their status. DOMA itself simply does not injure them or exclude them from some undefined benefit to which they might have been or might someday be entitled. In fact, they do not suggest that they have applied for any federal benefits, much less been denied any at this point.  That they might someday be married under the law of some state or ask for some federal benefit which they are denied is not enough.  In short, they have not spelled out a legally protected interest, much less one that was injured in a concrete and particularized way.

*Smelt*, 447 F.3d at 683-84 (citations omitted).  Bishop and Baldwin have not entered into a domestic partnership or any other type of legal relationship, rendering their standing to challenge Section 3 even more tenuous than the plaintiffs in *Smelt II*.  The Court concludes that Bishop and Baldwin lack standing to challenge the federal statutory definition of marriage because they cannot show that such definition has caused them or could imminently cause them a particularized injury.

In contrast to Plaintiffs Bishop and Baldwin, Plaintiffs Barton and Phillips have entered into two types of legal unions:  the Vermont civil union and the Canadian marriage.  Therefore, Barton and Phillips's legal status is clearly something more than a domestic partnership.  In *Smelt I*, the district court concluded that the plaintiffs' domestic partnership was not sufficient to confer standing to challenge Section 2 but was sufficient to confer standing to challenge Section 3.  The district court

reasoned:

> Plaintiffs are registered domestic partners in California, which is a "legal union" recognized by the state. For purposes of federal law, DOMA defines "marriage" as a legal union between one man and one woman. Plaintiffs' legal union is excluded from the federal definition of marriage because it is not between a man and a woman. Because of DOMA's definition, Plaintiffs' legal union cannot receive the rights or responsibilities afforded to marriages under federal law. This is a concrete injury personally suffered by Plaintiffs, caused by DOMA's definition of marriage. The United States concedes, and the Court agrees, Plaintiffs have standing to challenge section 3.

*Smelt I*, 374 F. Supp.2d at 871.  However, the Ninth Circuit in *Smelt II* reversed, finding that status as domestic partners under California law did not provide the plaintiffs with standing to challenge DOMA's definition of marriage.  In addition to the reasons stated above regarding plaintiffs' lack of an actual "marriage," the *Smelt II* court further reasoned:

> We, of course, recognize that the district court relied on the fact that Smelt and Hammer had a kind of "legal union" under California law because they were registered domestic partners.  However, that does not affect the alchemy at all.  California does not use the phrase "legal union"; it merely gives registered domestic partners certain legal rights and obligations.  And, those are certainly not the only legal relationships or unions possible if, indeed, we are going to move beyond the kinds that have historically defined a marriage. An ordinary partnership is a kind of legal union; so, too, in a way, is that special type of contract (or partnership) that can be formed when a man and a woman agree to live together outside of marriage.  And when a group forms a corporation, there is a kind of legal union also. None of those possible relationships or unions can logically be said to confer standing to attack DOMA's definition on its face simply because it refers to legal unions. There is no good reason to treat Smelt and Hammer's relationship any differently. Thus, the mere fact that Smelt and Hammer were in a kind of recognized legal relationship in California is not sufficient to confer standing upon them to attack Section 3 of DOMA on its face.

*Smelt II*, 447 F.3d at 684 (footnotes and citations omitted).

Applying the reasoning of *Smelt II*, the similarity between the plaintiffs in that case and Barton and Phillips is that a Vermont civil union, like a domestic partnership, is not equivalent to a marriage and therefore they are not "married" under any state law of the United States.  But there

13

are also some distinctions.  First, Barton and Phillips have been married in a foreign country.  *See*

*Smelt II*, 447 F.3d at 683 (reasoning that plaintiffs "are not even married under any state law, or, for

that matter, under the law of any foreign country").   Second, unlike a California "domestic

partnership," Vermont's statute uses the phrase "civil union."  *See id.* (reasoning that "California

does not use the phrase 'legal union'; it merely gives registered domestic partners certain legal rights

and obligations").   Third, the Ninth Circuit's reasoning that "there is no good reason" to treat the

plaintiffs' domestic partnership differently from other types of legal unions, such as corporations

or common-law marriages, for purposes of standing to challenge Section 3 is less persuasive as

applied to a Vermont civil union.  As explained above, a Vermont civil union is limited to members

of the same sex who are excluded from Vermont's definition of marriage.  Vermont created civil

unions in direct response to a court decision finding that same-sex couples were entitled to the same

rights as married individuals.  A Vermont civil union can only be dissolved by a proceeding similar

to a divorce proceeding.   In this Court's view, the status of two people who have joined in a

Vermont civil union simply cannot be compared to the status of two members of a corporate

partnership.  One couple is excluded from marital or spousal benefits under federal law, which they

desire based on their status as a committed, loving couple in a civil union recognized by the State

of Vermont.  The other "couple" is excluded from marital or spousal benefits under federal law that

they would never hope to receive or expect to receive, since their relationship has no indicia

whatsoever of an opposite-sex marriage.  It seems to ignore common sense and to elevate form over

substance to equate these two types of legal relationships for purposes of analyzing the injury

suffered as a result of the federal definition of marriage.  Due to these distinctions, the Court does

not find that Barton and Phillips lack constitutional standing as a matter of law at the pleading stage

of the case and will reserve ruling on the standing issue until a factual record and legal arguments are before the Court.

With respect to prudential standing, the court in *Smelt II* decided that, even if the plaintiffs had constitutional standing, their claim was in the form of a "generalized grievance" that could not meet the prudential standing requirements. Specifically, the court reasoned that "Section 3 is merely definitional" and the "words it defines are found in well over one thousand federal statutory enactments." *Smelt II*, 447 F.3d at 684-85. Because the plaintiffs did not identify a specific federal statute requiring cross-reference to DOMA's definition that "may apply to them at this time," the Court determined that it could not "know whether in the context of some particular statute as applied to some particular situation, Congress's use of the word 'marriage' will amount to an unconstitutional classification." *See id.* at 685 & n.35. Again, the Court concludes that it cannot decide the issue of prudential standing at the motion to dismiss stage and will reserve ruling until a factual record and legal arguments are before the Court.

In summary, the Court concludes that no Plaintiff has standing to challenge Section 2, that Bishop and Baldwin lack standing to challenge Section 3, and that Barton and Phillips' allegations are sufficient to survive a motion to dismiss on the issue of standing to challenge Section 3. The remaining discussion of the Federal Defendants' Motion to Dismiss assumes, for purposes of deciding the legal issues raised, that standing exists to challenge Section 3.

B.     *Full Faith and Credit Clause Challenge to Section 3*

The Complaint alleges that "DOMA, 1 U.S.C. § 7 *et seq.*, violates the Full Faith and Credit Clause of the United States Constitution by prohibiting the federal government from acknowledging and recognizing the rights, privileges, and immunities to which Plaintiffs Susan Barton and Gay

Phillips are entitled to as a result of their civil union." (Compl. ¶ 24.)[5] Section 3 of DOMA functions to define marriage for purposes of federal law, much like the Oklahoma Amendment defines marriage for purposes of Oklahoma law. The Federal Defendants argue that Section 3 cannot be challenged under the Full Faith and Credit Clause because Section 3 applies only to federal actors, and the Full Faith and Credit Clause is not binding on the federal government. With respect to whether the Full Faith and Credit Clause is binding on the federal government or binding only on the fifty states, the Ninth Circuit has explained:

> The first sentence of this guarantee is clear that it does not bind the federal government but the many states. In context, it is each of our fifty states who must give full faith and credit to the acts of the other states. The purpose of this clause was evidently to ensure a measure of unity for the United States by requiring each formerly independent State to respect and give credit to the judgments of the others. By its terms, and in light of its purpose, the Full Faith and Credit Clause imposes no obligation whatsoever on the federal government.

*Taylor v. Sawyer*, 284 F.3d 1143, 1152 (9th Cir. 2002) (citing *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 232-34 (1998); *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)). Because Section 3 does not prevent a state from taking any action, and instead applies only to the actions of the federal government, the Court concludes that Section 3 cannot be challenged under the Full Faith and Credit Clause.

      C.    *Privileges and Immunities Clause Challenge to Section 3*

The Privileges and Immunities Clause provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. CONST. art. IV, § 2. It "has been interpreted to prevent a state from imposing unreasonable burdens on citizens of another State." *See Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 383 (1978); *United States v.*

---

[5] At the time of filing the Complaint, Barton and Phillips had not yet been married in Canada.

*Rx Depot, Inc.*, 290 F. Supp.2d 1238, 1249 (N.D. Okla. 2003) (stating that Privileges and Immunities Clause "requires a State to accord residents and non-residents equal treatment when regulating the means of livelihood or doing business"). The Privileges and Immunities Clause does not affect the powers of the federal government and therefore does not provide a proper basis to challenge DOMA. *See Nehme v. INS*, 252 F.3d 415, 430 n.18 (5th Cir. 2001); *Nevada v. Watkins*, 914 F.2d 1545, 1555 (9th Cir. 1990) ("[T]he Privileges and Immunities Clause has been construed as a limitation on the powers of the States, not on the powers of the federal government.").[6]

> D.   *Equal Protection and Substantive Due Process Challenges to Section 3*

Unlike Plaintiffs' other legal challenges to Section 3, Plaintiffs' challenges based on the Equal Protection Clause and Substantive Due Process Clause are sufficient to survive a motion to dismiss. The Court concludes that such challenges are more appropriately decided at the summary judgment stage, because they may involve specific factual findings related to the purpose and justifications for the law. The Court would benefit from more developed arguments and citations to a record in deciding these issues. *See Smelt I*, 374 F. Supp.2d at 864 (deciding case based upon agreed factual record and cross motions for summary judgment).

IV.   <u>Oklahoma Amendment - State Defendants' Motion to Dismiss</u>

On November 2, 2004, the voters of Oklahoma approved and adopted legislative referendum no. 334, State Question no. 711, which was implemented as Article 2, Section 35 of the Oklahoma Constitution. The Oklahoma Amendment provides:

> "Marriage" Defined - Marriage Between Persons of Same Gender Not Valid or Recognized

---

[6] To the extent Plaintiffs argue Congress exceeded its authority under the Privileges and Immunities Clause in passing DOMA, there is no evidence that Congress relied on this clause in enacting DOMA, and the scope of Congress' authority under this clause is therefore irrelevant.

     A.     Marriage in this state shall consist only of the union of one man and one woman. Neither this Constitution nor any other provision of law shall be construed to require that marital status or the legal incidents thereof be conferred upon unmarried couples or groups.

     B.     A marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage.

     C.     Any person knowingly issuing a marriage license in violation of this section shall be guilty of a misdemeanor.

OKLA. CONST. art. 2, § 35.[7]  The Oklahoma Amendment has, in actuality, four parts.  First, Part A contains a definitional provision, which defines marriage as the union of one man and one woman. This provision has the effect of preventing same-sex couples from receiving a marriage license and from being married under the laws of the State of Oklahoma.  Second, Part A contains a type of reservation of power, which states that Oklahoma law shall not be construed to require that "marital status" or the "legal incidents thereof" be conferred upon those who are "unmarried."  This sentence is not a model of clarity.  However, it at least arguably has the effect of denying marital status or legal marital benefits (such as those benefits that would be occasioned by some type of legal same-sex union other than marriage) to those who do not fall within Oklahoma's definition of "married" as articulated in the previous sentence.  That is, Oklahoma law does not require the granting of marital status or the legal incidents thereof to those who are in a legal union consisting of something other than "one man and one woman," such as Barton and Phillips.  Third, Part B of the Oklahoma Amendment contains an express statement of Oklahoma's public policy against recognizing same-sex "marriages" performed in another "state."  Part B is Oklahoma's affirmation that it will, as authorized by Section 2 of DOMA, refuse to honor same-sex marriages performed in other states.

---

[7]  Prior to the Oklahoma Amendment, an Oklahoma statute already defined marriage as limited to persons of the "opposite sex," *see* OKLA. STAT. tit. 43, § 3 (1975) (superseded effective July 1, 2004), and had been interpreted by the Oklahoma Attorney General to limit marriages to unions of "one woman and one man," *see* 2004 OK AG 10 (March 19, 2004).

Finally, Part C contains a punishment provision, which makes it a criminal misdemeanor to issue a marriage license in violation of this subsection.  Plaintiffs' Complaint is not specific as to which provisions of the Oklahoma Amendment are being challenged.  The briefing before the Court does not implicate the punishment provision, and the Court construes Plaintiffs' challenge as being only to Parts (A) and (B) of the Oklahoma Amendment.

A.      Procedural Arguments Raised by State Defendants

1.      *Venue*

The Oklahoma Defendants raise three procedural arguments in support of their motion to dismiss.  First, they argue that the Northern District of Oklahoma is an improper venue.  Under the federal venue statute, an action may be brought in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.  *See* 28 U.S.C. § 1391(b).  The Court concludes that venue is proper in the Northern District of Oklahoma under § 1391(b)(2) because it is a district in which a substantial part of the events or omissions giving rise to the claim occurred.  Although Defendants argue there are no "events" that have occurred in this case, the Court disagrees.  In the context of declaratory judgments or prospective injunctive relief regarding unconstitutional statutes, it has been held that "suits challenging official acts may be brought in the district where the *effects of the challenged regulations are felt* even though the regulations were enacted elsewhere."  *Emison v. Catalano*, 951 F. Supp.2d 714, 722 (E.D. Tenn. 1996) (emphasis added); *see also Farmland Dairies v. McGuire*, 771 F. Supp. 80, 82 n.3 (S.D.N.Y. 1991); *Sheffield v. State of Texas*, 411 F. Supp. 706, 713 (N.D. Tex. 1976) (concluding that a

challenge to a state statute on constitutional grounds was properly brought in that district because "the effect of the statute's passage and administration ha[d] been clearly felt in the Northern District" and that the "injury alleged in this case has or will occur in the Northern District," despite the fact that the statute was passed and signed into law in Austin); *Johnson v. State of Mississippi*, 78 F.R.D. 37, 41 (N.D. Miss. 1977) (although cause may have originated in state capital where legislation was passed, the injury of denying the plaintiffs equal protection of the laws was inflicted in the forum and venue would have been proper in either district).  This is consistent with the well-accepted principle that "there can be more than one district in which a substantial part of the events giving rise to the claim occurred."  *See Globe Glass & Mirror Co. v. Brown*, 888 F. Supp. 768, 770 (E.D. La. 1995).

In this case, the effects of the Oklahoma Amendment will be felt in the Northern District in that Plaintiffs Bishop and Baldwin are denied the right to marry in Tulsa County based on their status as a same-sex couple.  Plaintiffs Barton and Phillips are denied the right to marry in Oklahoma and/or to have their Vermont civil union and/or Canadian marriage recognized as a legal relationship in Tulsa County.  If the Court were to accept the State Defendants' position on this issue, every plaintiff who contests the constitutionality of an Oklahoma statute would be forced to sue in the Western District of Oklahoma simply because that is where the legislation was passed or because that is where the Governor and Attorney General maintain their "official offices."   The Court believes a federal court in the Northern District of Oklahoma is a fair and suitable venue to decide the constitutionality of Oklahoma statutes that impact its residents.

Alternatively, the Court concludes that it may exercise pendent venue over Plaintiffs' claims related to the Oklahoma Amendment based on the existence of proper venue over Plaintiffs' claims

related to DOMA. "Under the doctrine of pendent venue, when two or more federal claims are brought and venue is properly laid as to one claim, that venue will support adjudication of the other related claim. The decision whether to exercise pendent venue is a matter of judicial discretion based upon the relatedness of the claims, judicial economy, convenience, and fairness." *Jackson v. MCI Telecommunications Corp.*, No. 92-2503, 1993 WL 408332, at * 2 (D. Kan. Sept. 29, 1993). Under 28 U.S.C. § 1391(e), venue is proper in a civil action in which an officer of the United States is sued in his official capacity in any judicial district where the plaintiff resides. Thus, venue is clearly proper for Plaintiffs' claims related to DOMA. Plaintiffs have asserted similar or identical arguments regarding the constitutionality of DOMA and the constitutionality of the Oklahoma Amendment. Thus, there is a "relatedness of claims" that supports the exercise of pendent venue. Further, the Court finds that the interests of judicial economy and convenience would be served by adjudicating the constitutionality of both laws in this district, rather than transferring the claims related to the Oklahoma Amendment to the Western District of Oklahoma. Finally, with respect to fairness, the State Defendants have not, and cannot, argue that litigating this case in the Northern District of Oklahoma, instead of the Western District of Oklahoma, imposes any burden or hardship on them. Accordingly, the court gives great weight to Plaintiff's choice of forum and, to the extent necessary, would exercise pendent venue over the claim that the Oklahoma Amendment is unconstitutional.

    2.  *Eleventh Amendment*

  Second, the State Defendants argue that Plaintiffs are procedurally barred from bringing their case against the State of Oklahoma based on the doctrine of sovereign immunity under the Eleventh Amendment. The Eleventh Amendment provides: "The Judicial power of the United States shall

not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.   United States Supreme Court case law has clarified, however, that notwithstanding state sovereign immunity, "where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 276-77 (1997); *Nelson v. Geringer*, 295 F.3d 1082, 1096 (10th Cir. 2002).  This is based on the *Ex parte Young* doctrine, under which "individuals may bring suit for prospective injunctive relief to prevent ongoing constitutional violations against individual state officials named in their official capacity even if the state is immune." *Nelson*, 295 F.3d at 1096.

The Tenth Circuit has interpreted the Supreme Court's decision in *Coeur d'Alene* as recognizing two limitations to the *Ex parte Young* doctrine: (1) where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right; and (2) where providing prospective injunctive relief would implicate "special sovereignty interests" and result in an intrusion that is the "functional equivalent" of a form of relief barred by the Eleventh Amendment.  *See id.* at 1096-97.   Neither limitation discussed by the Tenth Circuit is even potentially implicated here, and the Court concludes that the *Ex parte Young* doctrine allows Plaintiffs' request for prospective relief against the State Defendants to proceed.[8]

---

[8] In their brief, the State Defendants argue that *Ex parte Young* does not apply in this case because there is no "enforcement or threat of enforcement" by the relevant state officials. The State Defendants rely primarily on a Fifth Circuit case and Third Circuit case for these arguments.  First, the Court is constrained to apply the *Ex parte Young* doctrine as interpreted by the Tenth Circuit, and the Court is aware of no case law in the Tenth Circuit recognizing a third "limitation" on the *Ex parte Young* doctrine.  Second, these arguments relate more closely to the issues of standing and the requirement of a "case or controversy," which are already addressed.

3.      *Standing* - Part B of Oklahoma Amendment[9]

Part B of the Oklahoma Amendment prohibits only the recognition of a "marriage" performed in another "state." For the same reasons explained above with respect to Section 2 of DOMA, Plaintiffs Bishop and Baldwin lack standing to challenge Part B of the Oklahoma Amendment because they have no "marriage" they wish to have recognized in Oklahoma.

Plaintiffs Barton and Phillips have entered into a Vermont civil union and a Canadian marriage.  Language in Part B of the Oklahoma Amendment is more limited than language in Section 2 of DOMA in that it does not refer to any "public act, record, or judicial proceeding" that is "treated as a marriage."  Instead, it references only a "marriage."  In light of the Court's holding that even Section 2's more broad language does not extend to or implicate a Vermont civil union, the Court easily concludes that the language of Part B of the Oklahoma Amendment does not extend to civil unions.  Therefore, Part B does not expressly prohibit recognition of the Vermont civil union, and Barton and Phillips cannot show that Part B has caused or could imminently cause them a concrete and particularized injury by preventing recognition of their Vermont civil union.

The Court must also address whether the Canadian marriage confers standing.  As with Section 2 of DOMA, the Court interprets Part B of the Oklahoma Amendments' use of the word "state" to have the same meaning as that used in the Full Faith and Credit Clause, which is limited to "states" within the United States.  *See supra* Section III.B.  The Court finds this interpretation to be in accord with the general purpose of most "mini DOMAs" passed in several states, which are to make clear such states' intent not to extend full faith and credit to same-sex marriages performed

---

[9]  The Oklahoma Defendants do not tie their standing challenge to specific provisions of the Oklahoma Amendment, but the Court finds it necessary to separate Parts A and B in order to address standing.

in other states.  Therefore, Part B does not expressly prohibit recognition of Plaintiffs' Canadian marriage because it was not entered into in another state within the United States, and Plaintiffs cannot show that Part B has caused or could imminently cause them a concrete and particularized injury by preventing recognition of their Canadian marriage.  Thus, as with Section 2 of DOMA, no Plaintiffs have standing to challenge Part B of the Oklahoma Amendment.

    4. *Standing* - Part A of Oklahoma Amendment

   With respect to Part A of the Oklahoma Amendment, the definitional provision, the Court concludes that all four Plaintiffs have made sufficient allegations to survive a motion to dismiss on the issue of standing.  All four Plaintiffs desire to marry in the State of Oklahoma but are prevented from doing so based on the definition of marriage in the Oklahoma Amendment.  First, the alleged injuries in fact, which consist of various alleged invasions of their constitutional rights -  are personal or particularized in that the Oklahoma Amendment applies to prevent them from taking an action and affects them in an individual way.  In other words, they are not asserting injury based on the government's action against a third party.  *See Lujan,* 540 U.S. at 561-62 (discussing distinction between plaintiff himself being object of government action or inaction and plaintiff's injury flowing from government's regulation of a third party).  The Court also views the alleged injury as actual or imminent, not merely conjectural or hypothetical.  As argued by Plaintiffs, the Oklahoma Amendment is a "preemptive strike" which altogether prevents activities by Plaintiffs in which they wish to engage.  Second, the alleged injuries of not being able to marry someone of the same sex have a "causal connection" to the Oklahoma Amendment before the Court in that, but for the Oklahoma Amendment, Plaintiffs would get married or at least have one less obstacle to getting married in Oklahoma.  Finally, if the Court were to strike down Oklahoma's current definition of

marriage as unconstitutional, it is "likely," and not merely speculative, that Plaintiffs' injuries would be redressed.  The Court will revisit this issue at the summary judgment stage, after the parties  have had an opportunity to present factual allegations and legal arguments but concludes at this time that the allegations in the Complaint are sufficient.  For purposes of the legal arguments made by the State Defendants, which are addressed below, the Court assumes that all Plaintiffs have standing to challenge Part A of the Oklahoma Amendment.

       B.     <u>Substantive Arguments Raised by State Defendants</u>[10]

           1.     *Privileges and Immunities Clause Challenge to Part A*

To the extent Plaintiffs assert that Part A of the Oklahoma Amendment violates the Privileges and Immunities Clause of the Fourteenth Amendment, this argument is without merit. As stated by the Sixth Circuit:  "The Privileges and Immunities Clause has been largely dormant since the *Slaughter-House Cases*, 83 U.S. (16 Wall) 36, 21 L.Ed. 394 (1872), restricted its coverage to 'very limited rights of national citizenship' and held that clause [sic] did not protect an individual's right to pursue an economic livelihood against his own state."  *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).  Although there has been some recent speculation that the Privileges and Immunities Clause should have a broader meaning, *see Saenz v. Roe*, 526 U.S. 489 (1999) (Thomas, joined by Rehnquist, dissenting) (speculating that the development of the Privileges and Immunities Clause was prematurely stifled by the *Slaughter-House Cases*), the Tenth Circuit has

---

[10]  The Court does not find it necessary to address Plaintiffs' challenge to the Oklahoma Amendment based on the Full Faith and Credit Clause because the Court construes such challenge as being only to Part B of the Oklahoma Amendment.  Although the Complaint is not specific as to which provision allegedly violates the Full Faith and Credit Clause (*see* Complaint ¶ 25), it is clear that such challenge does not relate to Part A, which merely defines marriage for purposes of Oklahoma law and does not mention what affect Oklahoma must give other states' marriages.

made clear that the *Slaughter House Cases* remain good law unless the Supreme Court rules otherwise. *See Powers v. Harris*, 379 F.3d 1208, 1214 (10th Cir. 2004) (holding that *Slaughter House Cases* remained good law and prevented a Privileges and Immunities challenge to a state licensing law).

2.     *Equal Protection and Due Process Clause Challenge to Part A*

As with these challenges to Section 3 of DOMA,  the Court concludes that such challenges are more appropriately decided at the summary judgment stage.  Because the decision may involve findings related to the purpose and justifications for the Oklahoma Amendment, the Court would benefit from more developed arguments and citations to a record in deciding these issues. *See Smelt I*, 374 F. Supp.2d at 864 (deciding case based upon agreed factual record and cross motions for summary judgment).

V.    <u>Motion to Intervene</u>

The Honorable Thad Balkman ("Balkman") and Oklahomans for Protection of Marriage ("OFPM") (collectively "Proposed Intervenors") have moved to intervene pursuant to Federal Rule of Civil Procedure 24.  Balkman is the Oklahoma State Representative representing District 45. Balkman supported the passage of House Bill 2259 and the submission of Legislative Referendum No. 334, State Question 711, which ultimately passed and resulted in the Oklahoma Amendment at issue in this litigation.  OFPM is a non-profit Oklahoma corporation organized to advocate passage of State Question 711 and familiarize voters with the proposed constitutional amendment.  Proposed Intervenors seek to defend the constitutionality of the Oklahoma Amendment.

The Court first concludes that Balkman and OFPM do not qualify for intervention as a matter of right pursuant to Federal Rule of Civil Procedure 24(a) because the Court finds their interests will

be "adequately represented" by the State Defendants.  In order to show their interests will not be adequately represented, Proposed Intervenors cite to an Oklahoma Attorney General Opinion concluding that the Oklahoma State Department of Health was required under the Full Faith and Credit Clause to recognize out-of-state adoption decrees of Oklahoma children by same-gender adoptive parents.  They argue that this shows that the State Defendants will or might take a position contrary to their own on full faith and credit issues.  For the reasons explained above, the Court has already disposed of all challenges based on the Full Faith and Credit Clause.  There is no reason to believe, nor do Proposed Intervenors assert, the State Defendants will not adequately represent the their interests in the remaining aspects of the litigation.  Instead, Proposed Intervenors and the State Defendants have identical objectives of defending the constitutionality of Part A of the Oklahoma Amendment.  *See Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Dep't of the Interior*, 100 F.3d 837, 845 (10th Cir. 1996) ("[R]epresentation is adequate 'when the objective of the applicant for intervention is identical to that of one of the parties.'").

The Court, in its discretion, declines to allow permissive intervention under Federal Rule of Civil Procedure 24(b) because it does not believe intervention by Balkman and the OFPM as actual parties to the litigation is necessary or valuable to resolving this case.  The Court will, however, allow Balkman and/or the OFPM to file an amicus brief in support of the Oklahoma Amendment, setting forth any and all arguments it wishes to advance.  This process will afford the Court the benefit of Proposed Intervenors' arguments and expertise while avoiding the procedural difficulties and delays that could occur by making them formal parties to the case.

VI.    Conclusion and Further Orders

All Plaintiffs lack standing to challenge Section 2 of DOMA and Part B of the Oklahoma

27

Amendment.  There are no potential questions of fact that would preclude such a determination at this stage of the proceedings.  The determination of whether Plaintiffs Barton and Phillips have standing to challenge Section 3 of DOMA, and the determination of whether all Plaintiffs have standing to challenge Part A of the Oklahoma Amendment, are more appropriately decided at the summary judgment stage.

The Federal Defendants' Motion to Dismiss (Docket No. 15) is GRANTED in part AND DENIED in part.  It is granted as to Plaintiffs' challenge to Section 3 of DOMA based on the Full Faith and Credit Clause and the Privileges and Immunities Clause. It is denied as to Plaintiffs' challenge to Section 3 of DOMA based on the Substantive Due Process Clause and the Equal Protection Clause.

The State Defendants' Motion to Dismiss (Docket No. 7) is GRANTED in part and DENIED in part.  It is granted as to Plaintiffs' challenge to Part A of the Oklahoma Amendment based on the Privileges and Immunities Clause.  It is denied as to Plaintiffs' challenge to Part A of the Oklahoma Amendment based on the Substantive Due Process Clause and the Equal Protection Clause.

The Honorable Thad Balkman and Oklahomans For Protection of Marriage Inc.'s Motion to Intervene (Docket No. 4) is DENIED, but the Court will allow them to submit amicus briefs  in support of the Oklahoma Amendment.

Plaintiffs' Motion to Strike certain exhibits submitted by the Federal Defendants (Docket No. 33) is DENIED.  All exhibits submitted were subject to judicial notice, were properly considered at the motion to dismiss stage, and did not convert the motion to one for summary judgment.

The parties are hereby ORDERED as follows:

1.      The parties shall endeavor to submit a stipulated or at least partially stipulated statement of

facts.

2.      The parties shall submit cross motions for summary judgment, specifically limited to the

following remaining issues:

      a.      Standing of Barton and Phillips to challenge Section 3 of DOMA;

      b.      Equal Protection and Substantive Due Process Challenges to Section 3 of

      DOMA;

      c.      Standing of all Plaintiffs to challenge Part A of the Oklahoma Amendment;

      and

      d.      Equal Protection and Substantive Due Process Challenges to Part A of the

      Oklahoma Amendment.

3.      Proposed Intervenors may submit amicus briefs.

4.      Discovery will not be allowed except upon motion and approval by the Court.

The parties are referred to Magistrate Judge Sam A. Joyner for a scheduling conference at which

deadlines will be set for the above submissions.

The Clerk is directed to vacate the Opinion and Order, dated July 20, 2006, dkt. no. 90.

**ORDERED this 14th day of August, 2006.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**