IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Case No.: 04-CV-848-TCK-TLW

---

**MARY BISHOP** and **SHARON BALDWIN**, *et al.*,

*Plaintiffs*,

v.

**THE UNITED STATES OF AMERICA**, *et al.*,

*Defendants*,

and

**BIPARTISAN LEGAL ADVISORY GROUP
OF THE U.S. HOUSE OF REPRESENTATIVES**,

*Intervenor-Defendant*.

---

**DEFENDANT SALLY HOWE SMITH'S SUPPLEMENTAL BRIEF
ADDRESSING EFFECT OF *UNITED STATES V. WINDSOR* UPON PENDING
MOTIONS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT**

---

David Austin Robert Nimocks
Byron J. Babione
James A. Campbell
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Tel:   (480) 444-0020
Fax:   (480) 444-0028
Email: bbabione@telladf.org

John David Luton
Assistant District Attorney
DISTRICT ATTORNEY'S
OFFICE (TULSA)
500 South Denver Ave.
Suite 900
Tulsa, OK 74103-3832
Tel:   (918) 596-4814
Fax:   (918) 596-4804
Email: jluton@tulsacounty.org

The Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013), as Plaintiffs admit, was "limited to the constitutionality of . . . Section 3" of the federal Defense of Marriage Act (DOMA). Pls.' Supp. Mem. at 2. It held only that the federal government may not decline to recognize, for purposes of providing federal benefits, a same-sex marriage recognized by a State. *Windsor* does not forbid States like Oklahoma from preserving marriage as the union of one man and one woman. On the contrary, *Windor*'s repeated references to state sovereignty over the definition of marriage bolster the defense of Oklahoma's Marriage Amendment. *See, e.g.*, *Windsor*, 133 S. Ct. at 2689-90 ("By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States."); *id.* at 2691 (noting that the "regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States") (quotation marks omitted); *id.* (noting that the "definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations"); *id.* (noting that when the Constitution was adopted, the States "possessed full power over the subject of marriage and divorce"); *id.* at 2692 (referencing the States' "historic and essential authority to define the marital relation"); *id.* (noting that New York's decision to "recognize and then to allow same-sex marriages" was "without doubt a proper exercise of its sovereign authority within our federal system").

Plaintiffs' suggestion that *Windsor* definitively mandates that Oklahoma, and presumably all 50 States, must redefine marriage to include same-sex couples ignores the carefully circumscribed nature of the Court's holding and analysis. *See id.* at 2696 (emphasizing that the "opinion and its holding are confined to" the federal government's recognition of "lawful [same-sex] marriages"); *id.* at 2696-97 (Roberts, C.J., dissenting) ("The Court does not have before it, and the logic of its opinion does not decide, the distinct question whether the States, in the

exercise of their 'historic and essential authority to define the marital relation,' *ante,* at 2692, may continue to utilize the traditional definition of marriage."). This Court should therefore reject Plaintiffs' invitation to strike down Oklahoma's Marriage Amendment and should reaffirm, consistent with *Windsor*, the ability of Oklahoma to independently determine what marriage is, and what it shall be going forward.

**I.     *Windsor* Did Not Recognize a Fundamental Right to Marry a Person of the Same Sex.**

*Windsor* did not establish a fundamental right to marry a person of the same sex. Resisting this inescapable conclusion, Plaintiffs assert that *Windsor* created such a right when the Court stated that DOMA's Section 3 "violates basic *due process* and *equal protection* principles." Pls.' Supp. Mem. at 3 (quoting *Windsor*, 133 S. Ct. at 2693 (emphasis added)). But this passing reference to "due process" did not implicitly create a new fundamental constitutional right; rather, it is an acknowledgement, as evidenced by the Court's citation to the Fifth Amendment, that citizens have constitutional equal-protection rights against the federal government (as opposed to the States) *only* through the Due Process Clause of the Fifth Amendment. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) ("[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."); *Schneider v. Rusk*, 377 U.S. 163, 168 (1964) ("[T]he Fifth Amendment . . . forbid[s] discrimination that is so unjustifiable as to be violative of due process.") (quotation marks omitted). In other words, the federal government's contravening equal-protection principles necessarily constitutes a due-process violation. Tellingly, the *Windsor* Court cited only three cases in that paragraph of its decision—*Bolling v. Sharpe,* 347 U.S. 497 (1954), *Department of Agriculture v. Moreno,* 413 U.S. 528 (1973), and *Romer v. Evans,* 517 U.S. 620 (1996)—all of which are equal-protection cases. And the Court's

analysis, which discussed DOMA Section 3's differential treatment of two classes of marriage, focused on equal-protection considerations; it did not mention fundamental rights.

Instead of supporting Plaintiffs' "fundamental right" argument, *Windsor* undermines it. Fundamental rights are rights that, once "'careful[ly] descri[bed],'" are "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Yet *Windsor* recognized that the right to marry a person of the same sex is not deeply rooted in our traditions when it acknowledged that "most people" "throughout the history of civilization" have considered marriage's opposite-sex nature "essential to the very definition of [marriage] and to its role and function." *Windsor*, 133 S. Ct. at 2689.

Plaintiffs' insistence that the Constitution includes a fundamental right that mandates the redefinition of marriage to include same-sex couples is at odds with *Windsor*'s repeated affirmation of state sovereignty over the definition of marriage. *See, e.g., id.* at 2691 (noting that the "definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations"). The States, after all, would not have autonomy to determine the definition of marriage if the Constitution included a fundamental right depriving them of that very power.

Further weakening Plaintiffs' "fundamental right" argument is that none of the parties who challenged Section 3 of DOMA in *Windsor* asked the Supreme Court to address the fundamental right issue. *See* Br. on the Merits for Resp't Edith Schlain Windsor, *United States v. Windsor*, 133 S. Ct. 2675 (2013) (No. 12-307), 2013 WL 701228; Br. for United States on the Merits Question, *United States v. Windsor*, 133 S. Ct. 2675 (2013) (No. 12-307), 2013 WL 683048. It is unreasonable to suggest that the Supreme Court implicitly resolved this important constitutional question even though it was not raised by any of the parties.

3

**II.     *Windsor* Did Not Address, Let Alone Undermine, the Legitimate and Compelling State Interests Supporting Oklahoma's Decision to Preserve Marriage as the Union Between One Man and One Woman.**

Oklahoma's Marriage Amendment is rationally related to at least three legitimate and compelling state interests: (1) furthering marriage's traditional purpose of steering naturally procreative relationships into stable unions; (2) promoting the optimal childrearing environment of a mother and a father; (3) and avoiding significant unintended consequences that might accompany a fundamental redefinition of marriage. *See* Br. of Def. Sally Howe Smith at 26-40 (ECF No. 216). *Windsor*, which necessarily considered only the *federal government*'s interest in Section 3 of DOMA, casts no doubt on these interests when *a State* asserts them in support of preserving marriage as the union of one man and one woman.

Noting that the federal government in *Windsor* (through the House of Representatives' Bipartisan Legal Advisory Group) claimed some interests in support of DOMA's Section 3 that are similar to the interests that the State here (through Defendant Howe Smith) raises in support of the Marriage Amendment, Plaintiffs suggest that because the *Windsor* Court ignored those interests when asserted by the federal government, this Court should not approve those interests when raised by the State. Pls.' Supp. Mem. at 5. Yet this argument overlooks *Windsor*'s repeated themes: that "the definition and regulation of marriage . . . [is] within the authority and realm of the . . . States," 133 S. Ct. at 2689-90, and that it is illegitimate for the federal government to encroach upon that authority, *see id.* at 2693 (noting that DOMA's Section 3 "influence[d] a state's decision as to how to shape its own marriage laws"). Thus, even if the federal government may not legitimately assert certain interests to justify its intrusion on a matter of state authority, *Windsor* does not proclaim, let alone imply, that those same interests are

4

illegitimate when invoked by a State to support its decision to retain marriage as the union of one man and one woman.

By repeatedly stressing *Windsor*'s reference to the "unusual character" of DOMA's Section 3, Plaintiffs illustrate, perhaps unwittingly, that *Windsor* does not control here. *See* Pls.' Supp. Mem. at 4, 6. That federal statute was "of an unusual character," *Windsor*, 133 S. Ct. at 2692, not because it affirmed marriage as the union between one man and one woman, but because it "deviat[ed] from the usual tradition of recognizing and accepting state definitions of marriage," *id.* at 2693. Oklahoma's Marriage Amendment, in contrast, is anything but unusual. The State of Oklahoma, unlike the federal government, has "historic and essential authority to define the marital relation." *Id.* at 2692. And the Marriage Amendment does nothing more than enshrine the definition of marriage that continues to prevail in the vast majority of States—the understanding of marriage that, as the *Windsor* Court acknowledged, "most people" "throughout the history of civilization" have considered "essential to [its] very definition." *Id.* at 2689.

### III. *Windsor* **Did Not Displace the Supreme Court's Binding Precedent in** *Baker v. Nelson*.

*Baker v. Nelson*, 409 U.S. 810 (1972), not *Windsor*, is the Supreme Court precedent that dictates the outcome of this case. The Supreme Court in *Baker* dismissed for want of a substantial federal question a due-process and equal-protection challenge to a Minnesota law defining marriage as the union of one man and one woman. There being no Supreme Court authority to the contrary, *Baker* still binds this Court on the question whether States may affirm this definition of marriage. *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (finding that courts are prevented from "coming to opposite conclusions on the precise issues presented and necessarily decided" in summary decisions on the merits).

5

*Windsor* did not affect *Baker*'s continuing vitality. Indeed, the overwhelming majority of courts that have entertained challenges to DOMA's Section 3 have found *Baker* inapplicable because *Baker* involved a state law defining marriage rather than a federal law impinging on the States' prerogative to define marriage for themselves. *See, e.g. Windsor v. United States*, 699 F.3d 169, 178 (2d Cir. 2012) ("The question whether the federal government may constitutionally define marriage as it does in Section 3 of DOMA is sufficiently distinct from the question in *Baker*: whether same-sex marriage may be constitutionally restricted by the *states*."); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) ("*Baker* does not resolve our own case."); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 308 (D. Conn. 2012) (finding *Baker* "unrelated" to a DOMA Section 3 challenge); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n.5 (N.D. Cal. 2012) (similar); *Dragovich v. U.S. Dep't of Treasury*, 872 F. Supp. 2d 944, 952 (N.D. Cal. 2012) (similar); *Smelt v. Cnty. of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) (similar); *In re Kandu*, 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (similar). Following this guidance, this Court should conclude that *Windsor* does not displace *Baker* and hold that *Baker* controls this case.

**IV.     Plaintiffs' Discussion of the Oklahoma Marriage Amendment's Alleged Impact on Federal Benefits Does Not Advance Their Constitutional Claims.**

Plaintiffs' discussion about the purported impact that the Oklahoma Marriage Amendment might now have on their ability to access federal benefits adds nothing to their constitutional arguments. *See* Pls.' Supp. Mem. at 7-8. As Defendant Howe Smith demonstrated in her Motion for Summary Judgment, Oklahoma law defining marriage as the union of one man and one woman does not contravene the Constitution. It necessarily follows, then, that the alleged resulting impact on federal benefits does not either.

Furthermore, the purported withholding of federal benefits from Plaintiffs Barton and Phillips, the couple who entered into a legal union in California, is unfounded. Tellingly, they have not alleged that they applied for and were denied federal benefits after *Windsor*, and they admit that their claims about federal benefits are speculative, stating that "married lesbian and gay couples domiciled in Oklahoma . . . will *presumably* be precluded from receiving [some federal] benefits." Pls.' Supp. Mem. at 7 (emphasis added). While it is presently unsettled how the federal government will recognize same-sex marriages—whether based on the law where the couple entered into their union, the law where the couple resides, or some other combination of considerations, *see Windsor*, 133 S. Ct. at 2708 (Scalia, J., dissenting) (noting that Section 3 of "DOMA avoid[ed] difficult choice-of-law issues that will now arise absent a uniform federal definition of marriage")—existing authority suggests that the federal government will recognize same-sex marriages by "reference to the law of the [jurisdiction] which created those legal relationships," *see id*. at 2691. Not surprisingly, then, many federal agencies in the wake of *Windsor* have already embraced this place-of-celebration marriage-recognition rule.[1] Adopting

---

[1] *See, e.g.*, Statement of Secretary Janet Napolitano on the Implementation of the Supreme Court Ruling on the Defense of Marriage Act, U.S. Dep't of Homeland Sec., *available at* http://www.dhs.gov/topic/implementation-supreme-court-ruling-defense-marriage-act (announcing that the U.S. Citizen and Immigration Services will review immigration visa petitions filed on behalf of same-sex spouses "in the same manner as those filed on behalf of an opposite-sex spouse," by generally looking to the place of celebration of the marriage); Benefits Administration Letter from John O'Brien, Director for Healthcare and Insurance, U.S. Office of Pers. Mgmt. 1 (July 17, 2013), *available at* http://www.opm.gov/retirement-services/publications-forms/benefits-administration-letters/2013/13-203.pdf (informing federal employees that after *Windsor* "[b]enefits coverage is now available to a legally married same-sex spouse of a Federal employee or annuitant, *regardless of an employee's or annuitant's state of residency*") (emphasis added); Press Release, U.S. Dep't of Defense, DOD Announces Same-Sex Spouse Benefits (Aug. 14, 2013), *available at* http://www.defense.gov/releases/release.aspx?releaseid=16203 (indicating that the DOD will not only provide equal benefits to same-sex couples that are legally married, but will also "implement policies to allow military personnel in such a relationship non-chargeable leave for the purpose of travelling to a jurisdiction where

this approach to marriage recognition means, of course, that Plaintiffs Barton and Phillips will receive federal benefits, and thus their focus on this issue does not advance their legal claims.

V.     *Windsor* **Reinforces the Constitutionality of Section 2 of DOMA and Part B of the Oklahoma Marriage Amendment.**

*Windsor*, which addressed only the federal government's attempt through Section 3 of DOMA to *encroach upon* the States' authority to define marriage, does not call into question the constitutionality of Section 2 of DOMA and Part B of the Oklahoma Marriage Amendment, both of which *support* Oklahoma's autonomy to affirm its definition of marriage by ensuring that the State will not be forced to recognize within its borders foreign unions that conflict with the basic definition of marriage in Oklahoma. *See* Pls.' Supp. Mem. at 9-10. In fact, as explained below, *Windsor* reinforces the constitutionality of both those laws.

Initially, it must be reiterated that Plaintiffs Barton and Phillips lack standing to sue the United States or Defendant Howe Smith for allegedly violating Section 2 of DOMA or Part B of the Marriage Amendment, because only a state official who recognizes out-of-state marriages, not the United States or Defendant Howe Smith, may rely upon those provisions in declining to recognize Plaintiffs' California marriage. *See* Br. in Supp. of Mot. to Dismiss by United States of America (ECF No. 213) at 3-6 (establishing that Plaintiffs lack standing to sue the federal government for a purported violation of Section 2 of DOMA); Br. of Def. Sally Howe Smith (ECF No. 216) at 40-42 (establishing that Plaintiffs lack standing to sue Defendant Howe Smith for a purported violation of Part B of the Marriage Amendment).

Moreover, if the Court addresses the substantive merits of Plaintiffs Barton and Phillips's DOMA Section 2 and Marriage Amendment Part B claims, *Windsor* does not advance, but

---

such a marriage may occur" in order to provide "accelerated access to the full range of benefits offered to married military couples throughout the department.").

instead undermines, those claims. Unlike Section 3 of DOMA, Section 2 affirms the States' preexisting authority to decline to recognize, for their own state purposes, foreign unions that conflict with their fundamental definition of marriage, and thus it has the purpose and effect of supporting, rather than burdening, the States' sovereign decisions concerning the definition of marriage. *See* 28 U.S.C. § 1738C.[2]  This purpose and effect is squarely supported, not belied, by *Windsor*'s repeated recognition of the States' "full power over the subject of marriage," *Windsor*, 133 S. Ct. at 2691, including their "historic and essential authority to define the marital relation," *id.* at 2692, a matter at "the foundation of [their] broader authority to regulate the subject of domestic relations," *id.* at 2691.  Notably, this state authority, as *Windsor* acknowledged, includes not only a State's decision to define marriages created under its laws, but also its decision whether to "recognize" a marriage created under the laws of another jurisdiction. *See id*. at 2692 (noting that New York's decision to "recognize and then to allow same-sex marriages" was "a proper exercise of its sovereign authority").  *Windsor* thus confirms Oklahoma's decision to prevent foreign-created unions from undercutting its sovereign decision to affirm marriage as the union of one man and one woman.

Finally, Plaintiffs Barton and Phillips's attack on Section 2 of DOMA is misplaced, for Oklahoma's decision not to recognize foreign marriages that conflict with its own definition of marriage does not depend on that federal statute.  Long before DOMA's enactment, it was universally understood that "[e]very sovereign state may determine the [marital] status of those having their domicile within its territory." *Ross v. Bryant*, 217 P. 364, 365 (Okla. 1923).  This right of every State includes the autonomy to decline to recognize marriages that conflict with the State's public policy created in other jurisdictions by persons domiciled in the State. *See id.*

---

[2] Plaintiffs are thus incorrect when they assert that "Section 2's purpose coincides with and is part and parcel of fulfilling the legislative purposes of Section 3." Pls.' Supp. Mem. at 10.

9

at 365-66.  Section 2 of DOMA merely reflects, it does not create, this state authority.[3]  Plaintiffs Barton and Phillips thus misfire in setting their sights on that federal statute. [4]

          Respectfully Submitted,

          s/ *Byron J. Babione*

David Austin Robert Nimocks
Byron J. Babione
James A. Campbell
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Tel:    (480) 444-0020
Fax:    (480) 444-0028
Email: bbabione@telladf.org

John David Luton
Assistant District Attorney
DISTRICT ATTORNEY'S
OFFICE (TULSA)
500 South Denver Ave.
Suite 900
Tulsa, OK 74103-3832
Tel:    (918) 596-4814
Fax:    (918) 596-4804
Email: jluton@tulsacounty.org

---

[3] *See, e.g.*, William Baude, *Beyond DOMA: Choice of State Law in Federal Statutes*, 64 Stan. L. Rev. 1371, 1391-92 (2012) (stating that Section 2 of DOMA "is expressly intended to ratify" the "'public policy' exception" to recognizing foreign marriages that state "legislatures find . . . objectionable," and suggesting that no such ratification was necessary); Denise C. Morgan, *Introduction: A Tale of (at Least) Two Federalisms*, 50 N.Y.L. Sch. L. Rev. 615, 633 (2006) (Section 2 of "DOMA . . . does little to change existing law.  Historically, states have been free to decline to recognize out-of-state marriages that are inconsistent with their own policies.").

[4] To the extent that Plaintiffs Barton and Phillips suggest that the federal Full Faith and Credit Clause requires Oklahoma to recognize their California marriage, they are mistaken.  Supreme Court precedent "clearly establishes that the Full Faith and Credit Clause does not require a State to apply another State's law in violation of its own legitimate public policy."  *Nevada v. Hall*, 440 U.S. 410, 422 (1979); *see also Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 232 (1998) ("The Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate") (quotation marks omitted).

**CERTIFICATE OF SERVICE**

  I hereby certify that on August 23, 2013, I electronically transmitted Defendant Sally Howe Smith's Supplemental Brief Addressing Effect of *United States v. Windsor* upon Pending Motions and Cross-Motions for Summary Judgment to the Clerk of the Court using the ECF system for filing. I further certify that all parties in this case are registered CM/ECF users and will be served by the CM/ECF system.

                s/ *Byron J. Babione*
                Byron J. Babione