**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MARY BISHOP,** | ) |
| **SHARON BALDWIN,** | ) |
| **SUSAN BARTON, and** | ) |
| **GAY PHILLIPS,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )        **No. 04-CV-848-TCK-TLW** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| **ex rel. ERIC H. HOLDER, JR., in his** | ) |
| **official capacity as Attorney General** | ) |
| **of the United States of America; and** | ) |
| **SALLY HOWE SMITH, in her official** | ) |
| **capacity as Court Clerk for Tulsa County,** | ) |
| **State of Oklahoma,** | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **BIPARTISAN LEGAL ADVISORY** | ) |
| **GROUP OF THE U.S. HOUSE OF** | ) |
| **REPRESENTATIVES,** | ) |
| | ) |
| **Intervenor-Defendant.** | ) |

## OPINION AND ORDER

This Order addresses challenges to state and federal laws relating to same-sex marriage.  The

Court holds that Oklahoma's constitutional amendment limiting marriage to opposite-sex couples

violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  The

Court lacks jurisdiction over the other three challenges.

**I.      Factual Background**

This case involves challenges to: (1) both sections of the federal Defense of Marriage Act

("DOMA"), codified at 28 U.S.C. § 1738C and 1 U.S.C. § 7; and (2) two subsections of an

amendment to the Oklahoma Constitution, which are set forth in article 2, section 35(A)-(B) (the

"Oklahoma Constitutional Amendment").  All challenges arise exclusively under the U.S. Constitution.

### A.    DOMA

DOMA, which became law in 1996, contains two substantive sections.  Section 2 of DOMA, entitled "Powers Reserved to the States," provides:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

Defense of Marriage Act § 2, 28 U.S.C. § 1738C.  Section 3 of DOMA, entitled "Definition of Marriage," provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

*Id.* § 3, 1 U.S.C. § 7.  This federal definition, which was declared unconstitutional during the pendency of this lawsuit, informed the meaning of numerous federal statutes using the word "marriage" or "spouse" and functioned to deprive same-sex married couples of federal benefits.  *See United States v. Windsor*, 133 S. Ct. 2675, 2683 (2013) (striking down DOMA's definition of marriage, which controlled "over 1,000 federal laws in which marital or spousal status is addressed as a matter of federal law," as a violation of the Fifth Amendment to the U.S. Constitution).

2

**B.      Oklahoma Constitutional Amendment**

On November 2, 2004, Oklahoma voters approved State Question No. 711 ("SQ 711"),

which was implemented as article 2, section 35 of the Oklahoma Constitution.[1]  The Oklahoma

Constitutional Amendment provides:

> "Marriage" Defined – Construction of Law and Constitution – Recognition of Out-of-State Marriages - Penalty
>
> A.  Marriage in this state shall consist only of the union of one man and one woman. Neither this Constitution nor any other provision of law shall be construed to require that marital status or the legal incidents thereof be conferred upon unmarried couples or groups.[2]
>
> B.  A marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage.[3]
>
> C.  Any person knowingly issuing a marriage license in violation of this section shall be guilty of a misdemeanor.

Okla. Const. art. 2, § 35 (footnotes added).  Part A of the Oklahoma Constitutional Amendment

("Part A") is the definitional provision, which provides that marriage in Oklahoma "shall consist

only of the union of one man and one woman."  Part B of the Oklahoma Constitutional Amendment

("Part B") is the "non-recognition" provision, which provides that same-sex marriages performed

---

[1]  SQ 711 passed by a vote of 1,075,216 to 347,303.  (*See* Smith's Cross Mot. for Summ. J., Ex. 3.)

[2]  An Oklahoma statute also prevents same-sex couples from marrying.  Okla. Stat. tit. 43, § 3(A) ("Any unmarried person who is at least eighteen (18) years of age and not otherwise disqualified is capable of contracting and consenting to marriage with a person *of the opposite sex.*") (emphasis added).  This statute is not challenged.

[3]  An Oklahoma statute also prevents recognition of same-sex marriages.  Okla. Stat. tit. 43, § 3.1 ("A marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage.").  This statute is not challenged.

in other states "shall not be recognized as valid and binding" in Oklahoma.  Only Parts A and B are challenged in this lawsuit.

### C.   Procedural History[4]

In late 2004, Plaintiffs Mary Bishop and Sharon Baldwin ("Bishop couple") and Susan Barton and Gay Phillips ("Barton couple"), two lesbian couples residing in Oklahoma, filed a Complaint seeking a declaration that Sections 2 and 3 of DOMA and Parts A and B of the Oklahoma Constitutional Amendment violate the U.S. Constitution.  In August 2006, the Court denied a motion to dismiss filed by the Oklahoma Attorney General and Oklahoma Governor, rejecting their sovereign immunity argument.  *See Bishop I*, 447 F. Supp. 2d at 1255 (holding that suit was proper against these officials under the *Ex parte Young* doctrine).  The state officials appealed this Court's denial of sovereign immunity, and the Court stayed the proceedings pending appeal.

On June 5, 2009, the Tenth Circuit issued an unpublished decision reversing this Court's "failure to dismiss the claims against the Oklahoma officials" and remanding the "case for entry of an order dismissing these claims for lack of subject matter jurisdiction."  *See Bishop II,* 2009 WL 1566802, at *4.  The Tenth Circuit's reversal was based on Plaintiffs' lack of standing to pursue their claims against the named state officials:[5]

---

[4]  This case has a lengthy procedural history.  *See Bishop v. Okla. ex rel. Edmondson*, 447 F. Supp. 2d 1239 (N.D. Okla. 2006) ("*Bishop I*"); *Bishop v. Okla. ex rel. Edmondson*, No. 06-5188, 2009 WL 1566802 (10th Cir. June 5, 2009) ("*Bishop II*"); *Bishop v. United States*, No. 04-CV-848, 2009 WL 4505951 (N.D Okla. Nov. 24, 2009) ("*Bishop III*").  In this Opinion and Order, the Court only includes background facts that are relevant to the currently pending motions.

[5]  Because standing was not raised on appeal, the Tenth Circuit examined it *sua sponte*. (*See id.* at *2.)

The Couples claim they desire to be married but are prevented from doing so, or they are married but the marriage is not recognized in Oklahoma. These claims are simply not connected to the duties of the Attorney General or the Governor. Marriage licenses are issued, fees collected, and the licenses recorded by the district court clerks. *See* Okla. Stat. Ann. tit. 28, § 31; Okla. Stat. Ann. tit. 43, § 5. "[A] district court clerk is 'judicial personnel' and is an arm of the court whose duties are ministerial, except for those discretionary duties provided by statute. In the performance of [a] clerk's ministerial functions, the court clerk is subject to the control of the Supreme Court and the supervisory control that it has passed down to the Administrative District Judge in the clerk's administrative district." *Speight v. Presley*, 203 P.3d 173, 177 (Okla. 2008). Because recognition of marriages is within the administration of the judiciary, the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage. Moreover, even if the Attorney General planned to enforce the misdemeanor penalty (a claim not made here), that enforcement would not be aimed toward the Couples as the penalty only applies to the issuer of a marriage license to a same-sex couple. Thus, the alleged injury to the Couples could not be caused by any action of the Oklahoma officials, nor would an injunction (tellingly, not requested here) against them give the Couples the legal status they seek.

*Id.* at *3 (footnote omitted).

Following remand, Plaintiffs retained new counsel and were granted leave to file an Amended Complaint. As implicitly directed by *Bishop II*, Plaintiffs sued the Tulsa County Court Clerk in place of the previously named officials. Specifically, Plaintiffs sued "State of Oklahoma, ex rel. Sally Howe Smith, in her official capacity as Court Clerk for Tulsa County," alleging:

[Sally Howe Smith] is sued in her official capacity as Clerk of Tulsa County District Court. Pursuant to state law, she is the designated agent of the State of Oklahoma given statutory responsibility for issuing and recording marriage licenses.

(Am. Compl. ¶ 7.) The State of Oklahoma filed a second motion to dismiss, again asserting its immunity and arguing that it should be dismissed as a nominal party to the case. The Court granted this motion and dismissed the "State of Oklahoma" as a nominal party. *See Bishop III*, 2009 WL 4505951, at *3. Thus, the current Defendants to the lawsuit are: (1) United States of America, *ex rel.* Eric H. Holder, Jr., in his official capacity as Attorney General of the United States of America

("United States"); and (2) Sally Howe Smith ("Smith"), in her official capacity as Court Clerk for Tulsa County, State of Oklahoma.  Smith is represented by the Tulsa County District Attorney's Office and attorneys with an organization known as the "Alliance Defending Freedom."

Smith and the United States filed motions to dismiss the Amended Complaint.  The United States based its motion, in part, on the Barton couple's lack of standing to challenge Section 3 of DOMA.[6]  The Court ordered the Barton couple to provide more particularized facts regarding the federal benefits that were allegedly desired and/or sought but that were unavailable and/or denied as a result of Section 3.  After the Barton couple submitted supplemental affidavits, the United States conceded that the Barton couple had standing to challenge Section 3 and abandoned this section of its motion to dismiss.

On February 25, 2011, prior to the Court's issuing a decision on the pending motions to dismiss, the United States notified the Court that it would "cease defending the constitutionality of Section 3 of [DOMA]," thereby abandoning other portions of its previously filed motion to dismiss. (*See* Not. to Court by United States of Am. 1.)  The United States informed the Court of the possibility that members of Congress would elect to defend Section 3.  On July 21, 2011, the Bipartisan Legal Advisory Group of the U.S. House of Representatives ("BLAG") filed a motion to intervene "as a defendant for the limited purpose of defending Section 3."  (*See* Mot. of BLAG to Intervene 1.)  The Court permitted BLAG to intervene pursuant to Federal Rule of Civil Procedure 24(b)(1)(A) and referred the matter to Magistrate Judge T. Lane Wilson for a scheduling conference.  Magistrate Judge Wilson conducted the conference and entered an agreed schedule.

---

[6]  The Barton couple challenges both sections of DOMA and both sections of the Oklahoma Constitutional Amendment.  The Bishop couple challenges only Part A of the Oklahoma Constitutional Amendment.

Smith and the United States withdrew their previously filed motions to dismiss, and the briefing process began anew.

Although the Court did not issue a formal stay of the proceedings, the Court was aware that the United States Supreme Court had granted certiorari in two cases presenting nearly identical issues to those presented here – namely, the constitutionality of Section 3 of DOMA and the constitutionality of Proposition 8, a California ballot initiative amending the California Constitution to define marriage as between a man and a woman. The Court delayed ruling in this case pending the Supreme Court's decisions.

On June 26, 2013, the Supreme Court issued its heavily anticipated decisions in *United States v. Windsor*, 133 S. Ct. 2675 (2013) (addressing Section 3 of DOMA), and *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) (addressing Proposition 8). In *Windsor*, the Supreme Court held that Section 3 of DOMA "violates basic due process and equal protection principles applicable to the Federal Government." *Windsor*, 133 S. Ct. at 2693-94. This holding renders moot the Barton couple's challenge to Section 3. *See infra* Part III. In *Hollingsworth*, the Supreme Court held that the official proponents of Proposition 8 lacked standing. *See Hollingsworth*, 133 S. Ct. at 2662-68 (reasoning that the proponents of Proposition 8 had not been ordered "to do or refrain from doing anything" by the trial court and that "[t]heir only interest in having the district court's holding reversed was to vindicate the constitutional validity of a generally applicable California law"). Therefore, the Court did not reach the constitutionality of Proposition 8.

### D.     Barton Couple

Plaintiffs Susan Barton and Gay Phillips have resided in Oklahoma for over fifty years and currently own a home in Tulsa, Oklahoma. They also own Barton, Phillips, and Associates, Inc.,

a company that provides training to agencies serving homeless teens.  Ms. Phillips has a doctorate

degree in sociology, and Ms. Barton is an adjunct professor at Tulsa Community College, where she

teaches courses on "Building Relationships" and "Teaching Discipline."  The Barton couple has

been in a continuous, committed relationship since November 1, 1984.  They were united in a

Vermont civil union in 2001 and were married in Canada on May 16, 2005.  On November 1, 2008,

prior to filing their Amended Complaint, they were issued a marriage license by the State of

California and married under California law.[7]

    As a same-sex couple that has been legally married in the United States, the Barton couple

challenges Sections 2 and 3 of DOMA as violative of equal protection and substantive due process

rights guaranteed by the Fifth Amendment to the U.S. Constitution.  The Barton couple seeks a

declaratory judgment that DOMA is unconstitutional and a permanent injunction restraining

enforcement of DOMA.  As a same-sex couple that is denied the right to marry in Oklahoma, the

Barton couple challenges Part A of the Oklahoma Constitutional Amendment as violative of equal

protection and substantive due process rights guaranteed by the Fourteenth Amendment to the U.S.

Constitution.  The Barton couple also challenges Part B, which prohibits recognition of their

California marriage in Oklahoma, as violative of equal protection and substantive due process rights

guaranteed by the Fourteenth Amendment.[8]  As remedies, the Barton couple seeks a declaratory

---

[7]  When this Court issued its decision in *Bishop I,* the Barton couple had entered into a
Vermont civil union and a Canadian marriage.  The Court held that neither relationship was
"treated as a marriage in another State" and that the Barton couple lacked standing to challenge
Section 2.  *See Bishop I*, 447 F. Supp. 2d at 1245-49.  In their Amended Complaint, the Barton
couple includes allegations regarding their California marriage.

[8]  During the scheduling conference, Magistrate Judge Wilson raised the question of
whether the Amended Complaint asserted a challenge to Part B.  The Barton couple asserted that
they intended to challenge Part B in their Amended Complaint and desired to address Part B in
their summary judgment brief.  Smith did not object.  Therefore, based on certain allegations in

judgment that Parts A and B of the Oklahoma Constitutional Amendment violate the U.S. Constitution and a permanent injunction enjoining enforcement of Parts A and B.

### E.   Bishop Couple

Plaintiffs Mary Bishop and Sharon Baldwin have resided in Oklahoma throughout their lives and own a home in Broken Arrow, Oklahoma. They also jointly own a 1.3-acre lot in Osage County, Oklahoma. Ms. Bishop is an assistant editor at the *Tulsa World* newspaper, and Ms. Baldwin is a city slot editor at the *Tulsa World*. The Bishop couple has been in a continuous, committed relationship for over fifteen years and exchanged vows in a commitment ceremony in Florida in 2000. On February 13, 2009, the Bishop couple sought the issuance of a marriage license from Smith. Smith refused them a marriage license based upon their status as a same-sex couple.

As a same-sex couple that is denied the right to marry in Oklahoma, the Bishop couple challenges Part A of the Oklahoma Constitutional Amendment as violative of equal protection and substantive due process rights guaranteed by the Fourteenth Amendment to the U.S. Constitution. The Bishop couple seeks a declaratory judgment that Part A is unconstitutional and a permanent injunction enjoining enforcement of Part A.

### F.   Pending Motions

This Order substantively addresses the following pending motions: (1) the United States' motion to dismiss, in which the United States argues that the Barton couple lacks standing to challenge Section 2;[9] (2) the Barton couple's motion for entry of final judgment as to Section 3,

the body of the Amended Complaint and Smith's lack of objection, the Court construes the Amended Complaint as also challenging Part B.

[9] The United States' motion to dismiss only attacks standing and does not offer any defense of Section 2 on the merits. BLAG intervened for the limited purpose of defending the constitutionality of Section 3. Therefore, the only opposition to the Barton couple's challenge to

which they filed following the *Windsor* decision; (3) Plaintiffs' Motion for Summary Judgment, in which Plaintiffs argue that Sections 2 and 3 of DOMA and Parts A and B of the Oklahoma Constitutional Amendment violate the U.S. Constitution; and (4) Smith's Cross Motion for Summary Judgment, in which Smith argues that the Barton couple lacks standing to challenge Part B, and that Parts A and B do not violate the U.S. Constitution.

The Court holds: (1) the Barton couple lacks standing to challenge Section 2 of DOMA; (2) the Barton couple's challenge to Section 3 of DOMA is moot; (3) the Barton couple lacks standing to challenge Part B of the Oklahoma Constitutional Amendment; (4) the Bishop couple has standing to challenge Part A of the Oklahoma Constitutional Amendment;[10] and (5) Part A of the Oklahoma Constitutional Amendment violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

## II.    Barton Couple Lacks Standing to Challenge Section 2 of DOMA

In its motion to dismiss, the United States argues that the Barton couple lacks standing to challenge Section 2 because "any inability to secure recognition of their [California] marriage in Oklahoma would be attributable, not to the United States, but to the appropriate Oklahoma state official." (United States' Mot. to Dismiss 2.)[11]

Section 2 is the United States' standing argument.

[10]   The Court reaches the merits of Part A based upon the Bishop couple's standing and does not reach the question of whether the Barton couple also has standing to challenge Part A. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

[11]   As explained *infra* Part IV, Smith testified that she is not the state official connected to recognition of out-of-state marriages, and the Barton couple failed to controvert this evidence. Thus, the identity of the "appropriate State official" remains unclear.

10

A.      **Purpose of Section 2**

Preliminary discussion of the purpose and legislative history of Section 2 is warranted. Relevant to this case, Section 2 provides that no state "shall be required to give effect to" a marriage license of any other state if the marriage is between persons of the same sex. 28 U.S.C. § 1738(C). According to the House Report preceding DOMA's passage, the primary purpose of Section 2 was to "protect the right of the States to formulate their own public policy regarding legal recognition of same-sex unions, free from any federal constitutional implications that might attend the recognition by one State of the right for homosexual couples to acquire marriage licenses." *See* H.R. Rep. No. 104–664 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906.    More specifically, Congress was concerned that

> if Hawaii (or some other State) recognizes same-sex marriages, other States that do not permit homosexuals to marry would be confronted with the complicated issue of whether they are nonetheless obligated under the Full Faith and Credit Clause of the United States Constitution to give binding legal effect to such unions.

*Id.* at 2913.    The House Judiciary Committee ("Committee") determined that states already possessed the ability to deny recognition of a same-sex marriage license from another state, so long as the marriage violated a strong public policy of the state having the most significant relationship to the spouses at the time of the marriage. *Id.* However, the Committee also expressed its view that such conclusion "was far from certain." *Id.* at 2914; *see also id.* at 2929 ("While the Committee does not believe that the Full Faith and Credit Clause, properly interpreted and applied, would require sister states to give legal effect to same-sex marriages celebrated in other States, there is sufficient uncertainty that we believe congressional action is appropriate.").

In order to address this uncertainty, Congress invoked its power under the second sentence of the U.S. Constitution's Full Faith and Credit Clause (the "Effects Clause"), which permits

Congress to "prescribe the effect that public acts, records, and proceedings from one State shall have in sister States." *Id.* at 2929. The Committee described Section 2 as a "narrow, targeted relaxation of the Full Faith and Credit Clause." *Id.* at 2932. Consistent with this legislative history, Section 2 has been described by courts and commentators as permitting states to refuse to give full faith and credit to same-sex marriages performed in another state. *See Windsor,* 133 S. Ct. at 2682-83 ("Section 2, which has not been challenged here, allows States to refuse to recognize same-sex marriages performed under the laws of other States."); *Smelt v. Cnty. of Orange*, 447 F.3d 673, 683 (9th Cir. 2006) (explaining that "Section 2, in effect, indicates that no state is required to give full faith and credit to another states' determination that 'a relationship between persons of the same sex . . . is treated as a marriage'"); *Gill v. Office of Personnel Mgmt.*, 699 F. Supp. 2d 374, 378 (D. Mass. 2010) ("In enacting Section 2 of DOMA, Congress permitted the states to decline to give effect to the laws of other states respecting same-sex marriage.") (footnote omitted); Gillian E. Metzger, *Congress, Article IV, and Interstate Relations*, 120 Harv. L. Rev. 1468, 1532 (2007) ("Section 2's purpose, evident from its terms, is to ensure that states will not be required to recognize same-sex marriage by virtue of the Full Faith and Credit Clause.").[12]

---

[12] Since DOMA's passage, some scholars have concluded that Section 2 was unnecessary and simply reiterates a power that states already possessed. *See* Joshua Baker & William Duncan, *As Goes DOMA . . . Defending DOMA and the State Marriages Measures*, 24 Regent Univ. L. Rev. 1, 8 (2011-2012) ("Over time, something of a consensus seems to have developed among scholars that Section 2 of DOMA merely restates existing conflicts of law principles with respect to interstate recognition of a legal status or license . . . ."); William Baude, *Beyond DOMA: Choice of State Law in Federal Statutes*, 64 Stan. L. Rev. 1371, 1392 (2012) ("Section 2 of DOMA is expressly intended to ratify such [state public] policies (if any ratification were needed)."); Mary L. Bonauto, *DOMA Damages Same-Sex Families and Their Children*, 32 Fam. Adv. 10, 12 (Winter 2010) ("[S]tates have long possessed the power to decide which marriages they would respect from elsewhere, a power that both proponents and opponents of DOMA agree existed before and after DOMA."); Patrick Borchers, *The Essential Irrelevance of the Full Faith and Credit Clause to the Same-Sex Marriage Debate*, 38 Creighton Law R. 353, 358 (2005) (arguing that Section 2 of DOMA was unnecessary because it "simply

B.      **Standing Analysis**

The Barton couple bears the burden of proving that there is an actual "case or controversy"

regarding Part B. *See Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 756

(10th Cir. 2010) ("Article III of the Constitution limits the jurisdiction of federal courts to actual

cases or controversies."). This jurisdictional requirement is known as standing. "To establish

standing, plaintiffs bear the burden of demonstrating that they have suffered an injury-in-fact which

is concrete and particularized as well as actual or imminent; that the injury was caused by the

challenged [laws]; and that the requested relief would likely redress their alleged injuries." *Id.* This

three-pronged inquiry seeks to resolve three questions:

> Is the injury too abstract, or otherwise not appropriate, to be considered judicially
> cognizable? Is the line of causation between the illegal conduct and injury too
> attenuated? Is the prospect of obtaining relief from the injury as a result of a
> favorable ruling too speculative?

*Allen v. Wright*, 468 U.S. 737, 752 (1984).

For purposes of standing, the Court examines the allegations in the Amended Complaint.

*See Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) (explaining that, where an original

pleading has been amended, a court looks to the "amended complaint in assessing a plaintiff's

claims, including the allegations in support of standing"). Because the United States' standing

---

states what the law would be without it" and that "full faith and credit principles do not require
one state to give effect to a marriage celebrated in another state"); Metzger, *supra*, at 1532 ("[I]t
is unlikely that a state's refusal to recognize same-sex marriages would have violated Article
IV's full faith and credit demand even absent DOMA, at least as applied to same-sex marriage
involving state residents."); Mark Strasser, *As Iowa Goes, So Goes the Nation: Varnum v. Brien
and its Impact on Marriage Rights for Same-Sex Couples*, 13 J. Gender Race & Justice 153, 158
(Fall 2009) ("[E]ven without DOMA, states could have refused to recognize their domicilaries'
marriages validly celebrated elsewhere if such marriages violated an important public policy of
the domicile. Thus, DOMA did not give states a power that they did not already possess with
respect to the power to refuse to recognize domiciliaries' marriages that had been celebrated
elsewhere in accord with the latter states's law.").

attack was made at the Rule 12(b)(6) stage, the Court "accept[s] the allegations in the [Amended Complaint] as true for purposes of [its] standing analysis." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). Further, the Court must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (internal citation omitted).

The Court construes the Amended Complaint as alleging three injuries flowing from Section 2. First, the Barton couple alleges the injury of being unable to obtain recognition of their California marriage in Oklahoma ("non-recognition"). (*See* Am. Compl. ¶ 20.) Second, they allege the injury of unequal treatment, flowing from the United States' erection of Section 2 as a barrier to obtaining the benefit of recognition of their California marriage in Oklahoma ("unequal treatment"). (*See id.* ¶ 12; *see also* Pls.' Resp. to Mot. to Dismiss 12 (arguing that "[Section 2] operates as such a barrier in that it officially sanctions the denial of equal treatment of Plaintiffs' marriage and the attendant recognition/status that springs from such recognition").) Finally, they allege the injury of stigma and humiliation. (*See* Am. Compl. ¶ 22; *see also* Pls.' Resp. to Mot. to Dismiss 11-12 ("[Plaintiffs] have a second-class marriage in the eyes of friends, neighbors, colleagues, and the United States of America.").)

### 1.    Non-Recognition

The Court concludes that neither Section 2, nor the U.S. Attorney General's enforcement thereof, plays a sufficient "causation" role leading to the Barton couple's alleged injury of non-recognition of their California marriage in Oklahoma.[13]   Section 2 is an entirely permissive federal

---

[13]   The United States also argues that the Barton couple has not suffered an injury in fact based upon their failure to "have actually sought and been denied" recognition of their California marriage in Oklahoma. (*See* United States' Mot. to Dismiss 5.) For purposes of this motion, the Court assumes without deciding that the Barton couple's alleged injuries constitute injuries in

law.  28 U.S.C. § 1738C ("No State . . . shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . that is treated as a marriage under the laws of such other State . . . .").  It does not mandate that states take any particular action, does not remove any discretion from states, does not confer benefits upon non-recognizing states, and does not punish recognizing states.  The injury of non-recognition stems exclusively from state law – namely, Part B and title 43, section 3.1 of the Oklahoma Statutes  – and not from the challenged federal law.  *Cf. Gillespie v. City of Indianapolis*, 13 F. Supp. 2d 811, 818 (S.D. Ind. 1998) (city police officer was convicted of domestic violence crime, prohibited by federal law from carrying firearm, and then threatened with termination by the city) (court held that injury of threatened termination was "fairly traceable" to federal firearm law because "a firearms disability operates as virtually a total bar to employment as a police officer" and because any decision by local officials to fire the plaintiff "stems from the federal statute and not the exercise of independent discretion").  In contrast to the federal firearms prohibition, essentially mandating an officer's termination in *Gillespie*, Section 2 does not remove any local, independent discretion and is not a fairly traceable cause of the Barton couple's non-recognition injury.  *See generally* Bonauto, *supra* note 12, at 13 (explaining that "[l]egal challenges to section 2 of DOMA have been few, and none have succeeded, at least in part because it is the state's nonrecognition law that presents the impediment to recognition, not section 2 itself").

The Barton couple's reliance on *Bennet v. Spears*, 520 U.S. 154 (1997), is misplaced.  In *Bennet*, the Supreme Court addressed whether the injury of reduced water for irrigation was fairly traceable to a "Biological Opinion" authored by the Fish and Wildlife Service, where another agency

---

fact but concludes that none were sufficiently caused by Section 2.

actually issued the final decision regarding the volume of water allocated.  *Id*. at 168-71.  The Biological Opinion, although not the "very last step in the chain of causation," had a "powerful coercive effect" and a "virtually determinative effect" on the action ultimately taken by the other agency.  *See id.* at 169.  While the other agency was "technically free" to disregard the Biological Opinion, it would do so at its own peril, including civil and criminal penalties.  *Id.* at 170.  In contrast to the Biological Opinion, Section 2 does not have any coercive or determinative effect on Oklahoma's non-recognition of the Barton couple's California marriage.  At a maximum, it removes a potential impediment to Oklahoma's ability to refuse recognition – namely, the Full Faith and Credit Clause.  *See supra* Part III(A) (explaining Section 2's purpose); note 12 (explaining that Full Faith and Credit Clause may not actually be an impediment).  A federal law that removes one potential impediment to state action has a much weaker "causation" link than a federal agency opinion that has a coercive effect on another federal agency's action.

The Court must address dicta in *Bishop I* that is inconsistent with the above reasoning regarding Section 2.  In 2006, this Court addressed standing issues *sua sponte* and implied that, if the Barton couple obtained legal status that was "treated as a marriage" in another state, they would have standing to challenge Section 2.  *See Bishop I*, 447 F. Supp. 2d at 1246 (describing Section 2 as "preventing, or at least arguably preventing" the Barton couple from obtaining legal recognition in Oklahoma).  The Court's use of the phrase "prevents, or at least arguably prevents" was in error.  Section 2 does not "prevent" or even "arguably prevent" Oklahoma from recognizing the Barton couple's California marriage.  At most, Section 2 removes one potential impediment to a state's

16

ability to refuse recognition of the marriage.  Therefore, the Court's dicta in *Bishop I* has been

reconsidered and is superseded by this Opinion and Order.[14]

**2.      Unequal Treatment**

The Barton couple also alleges the injury of unequal treatment resulting from the imposition

of Section 2 as a "barrier" to the benefit of recognition of their California marriage.  In certain equal

protection cases, the right being asserted is not the right to any specific amount of denied

governmental benefits; it is "'the right to receive benefits distributed according to classifications

which do not without sufficient justification differentiate among covered applicants solely on the

basis of [impermissible criteria].'"  *See Day v. Bond*, 500 F.3d 1127, 1133 (10th Cir. 2007) (quoting

*Heckler v. Mathews*, 465 U.S. 728, 737 (1984)).  In such cases, the "injury in fact . . . is the denial

of equal treatment resulting from the imposition of the [allegedly discriminatory] barrier, not the

ultimate inability to obtain the benefit."  *Ne. Fla. Ch. of the Associated Gen. Contractors of Am. v.

City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993); *Day*, 500 F.3d at 1133 (explaining that the

injury in such cases "is the imposition of the barrier itself").  Although these standing principles are

most commonly applied to competitive benefit programs, *i.e.*, those for which there are a limited

number of beneficiaries, the Tenth Circuit has also applied such principles to non-competitive

benefit programs.  *See Day*, 500 F.3d at 1131-35 (applying "equal opportunity" standing analysis

to equal protection challenge to Kansas statute setting rules for receipt of in-state tuition at state

universities).

---

[14]  The Barton couple incorrectly argues that this dicta is controlling.  The Barton couple
filed an Amended Complaint, which renders moot this Court's analysis of standing allegations in
the original Complaint.  *See Mink*, 482 F.3d at 1254.  Further, the Court has an independent
obligation to satisfy itself of standing at all stages of the proceedings, *see City of Colo. Springs v.
Climax Molybdenum Co.*, 587 F.3d 1071, 1078-79 (10th Cir. 2009), and this necessarily includes
reconsideration of prior reasoning.

17

The Court concludes that these "discriminatory barrier" cases are not applicable due to the permissive nature of Section 2.  As explained above, Section 2 is not an allegedly discriminatory policy that Oklahoma must follow in deciding what marriages to recognize, and it does not stand as any significant obstacle between the Barton couple and recognition of their California marriage in Oklahoma.  *Cf. Ne. Fla. Ch. of the Associated Gen. Contractors of Am.*, 508 U.S. at 666 (minority set-aside program was "barrier" to non-minority gaining government contracts, the removal of which would have allowed non-minorities to compete equally); *Turner v. Fouche*, 396 U.S. 346, 361-64 (1970) (law limiting school board membership to property owners was "barrier" to non-property owners gaining election to school board, the removal of which would have allowed non-property owners to compete equally); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998) (policy favoring long-term residents was "barrier" to short-term resident gaining access to medical school, the removal of which would have allowed short-term residents to compete equally).  These cases are particularly unhelpful to the Barton couple because they have not challenged Part B of the Oklahoma Constitutional Amendment (which prohibits recognition and is the more direct cause of their injury) as violating the Full Faith and Credit Clause (which is the impediment to Part B's legality that Section 2 potentially alleviates).  Instead, they only challenged Part B as violative of their equal protection and substantive due process rights.

### 3.    Stigma

The Barton couple also alleges that the mere existence of Section 2 – separate from any impact it has on their legal status as married or unmarried – causes ongoing stigmatic harm by indicating that their same-sex marriage is "second-class."   Stigmatic injuries are judicially cognizable in certain circumstances, particularly those involving racial discrimination.  *See Allen*,

468 U.S. at  755 (explaining that "stigmatizing injury often caused by racial discrimination" is a "sort of noneconomic injury" that is "sufficient in some circumstances to support standing"); *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) (explaining that "stigmatizing injury often caused by racial discrimination can be sufficient in some circumstances to support standing" and applying concept to advertising scheme that allegedly discriminated based upon gender).  Assuming these cases extend to stigmatic injuries to non-suspect classes, *see infra* Part VI(D)(2)(a) (concluding that same-sex couples desiring a marriage license are not a suspect class), the stigma still must be causally linked to some concrete interest discriminatorily impaired by Part B of the Oklahoma Constitutional Amendment.  *See Allen*, 468 U.S. at 757 n.22 (explaining that a plaintiff premising standing on a stigmatic injury must (1) identify "some concrete interest with respect to which [she is] personally subject to discriminatory treatment[;]" and (2) show that this concrete interest "independently satisf[ies] the causation requirement of standing doctrine"). For the same reasons explained above, Section 2 lacks a sufficient causal link to any stigmatic injury the Barton couple is suffering due to non-recognition of their California marriage.  The stigmatic harm flows most directly from Oklahoma law and is only possibly strengthened in some manner by Section 2.  Therefore, the Barton couple's allegations do not establish standing to challenge Section 2, and this claim is dismissed for lack of jurisdiction.[15]

---

[15]  The United States also argues that the Barton couple's alleged stigmatic injury is not cognizable because it is merely a "'psychological consequence presumably produced by observation of conduct.'"  (*See* United States' Reply in Support of Mot. to Dismiss 4 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 485 (1982), and also relying upon *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 806-08 (7th Cir. 2011).)  However, the Court's holding is premised on the Barton couple's inability to show causation.  The Court is not persuaded that the United States' cited cases would extend to the more personal type of injury alleged here.  *Cf. Freedom from Religion Found. Inc.*, 641 F.3d at 806-08 (concluding that the "perceived slight" or "feeling of exclusion" suffered by one of many observers of President Obama's remarks during National Day of Prayer did not

### III.   Barton Couple's Challenge to Section 3 of DOMA Is Moot

The Barton couple moves for entry of a final judgment on their challenge to Section 3 in light of the Supreme Court's decision in *Windsor*.   The United States argues that *Windsor* moots the Barton couple's Section 3 challenge and that the Court lacks jurisdiction over this challenge.

### A.   Mootness Standard

"Mootness, like standing, is a jurisdictional doctrine originating in Article III's 'case' or 'controversy' language."  *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012).   Thus, a court "must decline to exercise jurisdiction where the award of any requested relief would be moot, i.e. where the controversy is no longer live and ongoing." *Wirsching v. Colo.*, 360 F.3d 1191, 1196 (10th Cir. 2004).   The defendant bears the burden of proving mootness, *WildEarth Guardians*, 690 F.3d at 1183, and this burden is a heavy one, *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012).   If a defendant carries its burden of showing mootness, a court lacks subject matter jurisdiction.   *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010).

### B.   Prayer for Relief

In their prayer for relief, the Barton couple seeks "a declaration that [Section 3 of DOMA] violate[s] the U.S. Constitution's Equal Protection and substantive Due Process Rights of Plaintiffs Barton and Phillips."  (Am. Compl. 10.)  They also seek an "award of their attorney fees and costs in prosecuting this action" and "[s]uch other relief deemed proper."  (*Id.*)  The Court will analyze each request to determine if any "live and ongoing" controversy remains following the *Windsor* decision.

_____

confer standing).

### 1.    Declaratory Relief

"[W]hat makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Rio Grande Silvery Minnow*, 601 F.3d at 1109-10.  The "crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Id.* at 1110 (internal citation omitted); *see also Rezaq*, 677 F.3d at 1008 ("[I]n the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant."); *Wirsching*, 360 F.3d at 1196 (same).

The Court concludes that there is no longer any live or ongoing controversy as to the Barton couple's request for declaratory relief regarding Section 3.  In *Windsor*, the Supreme Court held that Section 3 "violates basic due process and equal protection principles applicable to the Federal Government." *Windsor*, 133 S. Ct. at 2693-94 (reasoning that "DOMA's principal effect is to identify a subset of state-sanctioned marriages and make them unequal").  As a general rule, where a law has been declared unconstitutional by a controlling court, pending requests for identical declaratory relief become moot. *Thayer v. Chiczewski*, 705 F.3d 237, 256-57 (7th Cir. 2012) (claim for declaratory and injunctive relief moot in light of Seventh Circuit's invalidation of challenged law in another case); *Longley v. Holahan*, 34 F.3d 1366, 1367 (8th Cir. 1994) (claim moot where challenged statute was declared unconstitutional in companion case); *Eagle Books, Inc. v. Difanis*, 873 F.2d 1040, 1042 (7th Cir.1989) (claim moot where state supreme court had declared challenged statute unconstitutional); *see also Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (claim moot where challenged statute was repealed).  Because Section 3 has

already been declared unconstitutional by the Supreme Court, an identical declaration by this Court will have no further impact on the United States' actions.[16]

Second, the United States has presented compelling evidence that, following *Windsor*, it has ceased to enforce Section 3 and that the Barton couple will suffer no further injury as a result of Section 3.  In Revenue Ruling 2013-17, the U.S. Department of the Treasury and the Internal Revenue Service ("IRS") provided "guidance on the effect of the *Windsor* decision on the [IRS'] interpretations of the [federal tax code] that refer to taxpayers' marital status," stating that

> individuals of the same sex will be considered to be lawfully married under the Code as long as they were married in a state whose laws authorize the marriage of two individuals of the same sex, *even if they are domiciled in a state that does not recognize the validity of same-sex marriages.*

(Rev. Ruling 2013-17, 2013-381.R.B.28 (emphasis added), Ex. B to United States' Not. of Admin. Action.)  In a news release, the IRS stated that "same sex couples will be treated as married for all federal tax purposes," including "filing status, claiming personal and dependency exemptions, taking the standard deduction, employee benefits, contributing to an IRA and claiming the earned income tax credit or child tax credit."  (I.R.S. News Release, IR-2013-72 (Aug. 29, 2013), Ex. A to United States' Not. of Admin. Action.)  Thus, Section 3 of DOMA will no longer be used to deprive the Barton couple of married status for any federal tax purpose because (1) they have a legal California marriage, and (2) Oklahoma's non-recognition of such marriage is irrelevant for federal tax

---

[16]  BLAG, the only party defending the constitutionality of Section 3, has stated that "the Supreme Court recently held that DOMA Section 3 is unconstitutional" and that its "justification for participating in this case . . . has disappeared."  (BLAG's Unopposed Mot. to Withdraw 1-2.) BLAG's disinterest in any further defense of Section 3 supports the Court's conclusion that its entry of a declaratory judgment would have no effect.

purposes.  Any ongoing threat of injury based upon deprivation of married status for tax purposes has been rendered moot by *Windsor* and the IRS' response thereto.[17]

In their evidentiary proffers regarding standing to challenge Section 3, the Barton couple asserts harms other than adverse tax consequences, such as an inability to plan for Social Security survivor benefits.  The Barton couple argues that *Windsor* may affect the interpretation of the word "married" by other federal agencies and that this Court must ensure that the Barton couple reaps the full benefit of the *Windsor* decision.  However, all evidence before the Court indicates that Section 3 will no longer be used to deprive married same-sex couples of federal benefits that are bestowed upon married opposite-sex couples, even when those couples live in non-recognizing states such as Oklahoma.  The *Windsor* decision changed the legal landscape in such a drastic manner that the Barton couple no longer faces any reasonable threat of being denied equal protection of federal laws related to marriage.  Were the Court to issue a declaratory judgment, it would be issuing an opinion based on a hypothetical application of Section 3 that is no longer likely to occur.  *See Rio Grande Silvery Minnow*, 601 F.3d at 1117 ("A case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency.") (alterations and citation omitted).

### 2.  Attorney Fees and Costs

The Barton couple also requests attorney fees and costs.  However, the possibility of recovering attorney fees or costs is not a sufficient reason to enter judgment in an otherwise moot

---

[17]  This is not a case in which the United States is showing any "reluctant submission" to complying with *Windsor*.  *See Rio Grande Silvery Minnow*, 601 F.3d at 1116 (explaining that a case may not be moot if a governmental actor is showing "reluctant submission" or a "desire to return to the old ways").  The United States has given every indication that the Supreme Court's ruling will be implemented in a manner that ceases to cause the Barton couple any injury related to payment of federal income taxes.

case. *See R.M. Inv. Co. v. U.S. Forest Serv.*, 511 F.3d 1103, 1108 (10th Cir. 2007) (explaining that a claim of entitlement to attorney fees does not preserve a moot cause of action); *In re West. Pac. Airlines, Inc.*, 181 F.3d 1191, 1196 (10th Cir. 1999) ("Precedent clearly indicates that an interest in attorney's fees is insufficient to create an Article III case or controversy where a case or controversy does not exist on the merits of the underlying claim."); 13C Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 3533.3 (3d ed. 2008) ("If the action is mooted before any decision on the merits by the trial court, a statute that awards fees to the prevailing party does not justify decision on the merits in order to determine if that party would have prevailed absent mootness.") ("Claims for costs traditionally have not been thought sufficient to avoid mootness, presumably on the theory that such incidental matters should not compel continuation of an otherwise moribund action.").

### 3.     "Other Relief Deemed Proper"

The Barton couple does not expressly request money damages as relief.  However, they urge the Court to construe their request for "other relief deemed proper" as a request for money damages. They are now urging this construction because, unlike claims for declaratory or injunctive relief, claims for damages are not mooted by subsequent events.  *See In re West. Pac. Airlines, Inc.*, 181 F.3d at 1196 (explaining that, although declaratory and injunctive relief was rendered moot by a defendant's release from prison, a damages claim was still viable because it would alter the defendant's behavior by forcing them to pay money); Charles Alan Wright, *et al.*, *supra*, § 3533.3 ("Untold number of cases illustrate the rule that a claim for money damages is not moot, no matter how clear it is that the claim arises from events that have completely concluded without any prospect of recurrence.").  In the Tenth Circuit, this same rule applies to claims for nominal damages.  *Utah Animal Rights Coal.*, 371 F.3d at 1257-58 ("It may seem odd that a complaint for nominal damages

could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory relief will not.  But this Court has squarely so held.") (internal footnotes omitted).

The Court does not construe the "other relief deemed proper" language as a request for compensatory or nominal damages against the United States for three reasons.  First, the Barton couple has repeatedly argued, in response to certain ripeness and standing deficiencies raised by BLAG, that their Section 3 injury was not any specific denial of monetary benefits but was instead the ongoing injury of unequal access and/or unequal treatment caused by Section 3.  (*See, e.g.*, Pls.' Resp. to BLAG's Cross Mot. for Summ. J. (containing heading entitled "BLAG's Argument Regarding Standing is Without Merit, as Plaintiffs Do Not Request Monetary Damages and DOMA Was the Cause of their Injury").)  This case has focused entirely on prospective declaratory relief, rather than injunctive relief related to a specific tax refund, and the Court finds no legitimate basis to now construe the Amended Complaint as seeking money damages.  Second, the United States is generally immune from suits for money damages, and the Barton couple has not identified any waiver or statutory exception that would apply here.  *See Wyodak Res. Dev. Corp. v. United States*, 637 F.3d 1127, 1130 (10th Cir. 2011) (explaining that suits for damages against the United States must proceed under the Tucker Act in the Court of Federal Claims or under some other statutory immunity waiver).  Finally, the Barton couple has not urged the Court to construe the Amended Complaint as requesting nominal damages.  (*See* Pls.' Reply in Support of Mot. for Entry of J. 7-10.) Even if they had, these decisions generally require an express request, which was not made in the Amended Complaint.  *See R.M. Inv. Co.*, 511 F.3d at 1107 (rejecting argument that suit should be construed as one seeking nominal damages and stating that "[b]ecause [the plaintiff] has no claim for nominal damages, it cannot rely on nominal-damages cases to overcome mootness"); Charles

Alan Wright, *et al.*, *supra*, §3533.3 ("But failure to demand nominal damages may lose the opportunity to avoid mootness."). Accordingly, the Barton couple's Section 3 challenge is not saved by the "other relief" language in the Amended Complaint.

C.      **Conclusion**

The Barton couple has only requested prospective declaratory relief regarding Section 3, and such request has been rendered moot in light of *Windsor* and the United States' response thereto. The United States has satisfied its burden of showing mootness, and the Court lacks jurisdiction to enter any judgment in favor of the Barton couple. Based on this ruling, the Court agrees with BLAG's assertion that it has no further role to play in this litigation. BLAG's motion to withdraw as an intervening party is therefore granted, and its motion for summary judgment is denied as moot.

Although the Barton couple will not receive a judgment in their favor as to this claim, they have played an important role in the overall legal process leading to invalidation of Section 3 of DOMA. The Barton couple filed this lawsuit many years before it seemed likely that Section 3 would be overturned. Although other plaintiffs received the penultimate judgment finding DOMA's definition of marriage unconstitutional, the Barton couple and their counsel are commended for their foresight, courage, and perseverance.

**IV.    Barton Couple Lacks Standing to Challenge Part B of the Oklahoma Constitutional Amendment**

*Bishop II* held that, in order to have standing in this case, Plaintiffs must establish a connection between the state official sued and the alleged injury. *See Bishop II*, 2009 WL 1566802, at *3 (holding that Plaintiffs lacked standing to sue Oklahoma Governor or Oklahoma Attorney General in their challenge to Parts A and B because these officials did not have a sufficient enforcement connection to the challenged Oklahoma laws). The Tenth Circuit indicated that district

court clerks were the Oklahoma officials with a connection to Plaintiffs' injuries because "[m]arriage licenses are issued, fees collected, and the licenses recorded by the district court clerks." *Id.*  Notably, the statutes cited in *Bishop II* do not reference court clerks' authority to "recognize" an out-of-state marriage.  In support of her motion for summary judgment, Smith submitted an affidavit stating that she has "no authority to recognize or record a marriage license issued by another state in any setting, regardless of whether the license was issued to an opposite-sex or same-sex couple" and that "[t]here are no circumstances in which the Clerk of Court of Tulsa County would be authorized to recognize a marriage license issued by another state."  (*See* Smith Aff. ¶ 5, Ex. A to Smith's Cross Mot. for Summ. J.)  The Barton couple has not controverted this evidence in any manner.  Instead, the Barton couple argues that, in *Bishop II*, the Tenth Circuit "has deemed [Smith] to be the appropriate party."  (Pls.' Reply to Smith's Cross Mot. for Summ. J. 27.)

Based upon the evidence before the Court, Smith is entitled to summary judgment.  Although *Bishop II* explained that clerks of court were generally the Oklahoma officials connected with the types of injuries alleged in the Amended Complaint, that decision was at the Rule 12(b)(6) stage.  In her affidavit, Smith denies that she, or any other district court clerk in Oklahoma, has authority to recognize any out-of-state marriage and therefore denies her ability to redress the Barton couple's non-recognition injury.  The Barton couple has failed to controvert Smith's testimony in any manner or demonstrate that she would indeed be the proper official to "recognize" their California marriage.  Citation to *Bishop II*, and inconclusive Oklahoma statutes cited therein, is not sufficient to create a question of fact in light of Smith's uncontroverted denial of authority.

A recent case addressed the constitutionality of Ohio's non-recognition provision, which was identical to Part B.  *See Obergefell v. Wymyslo*, --- F. Supp. 2d ----, No. 1:13-cv-501, 2013 WL

6726688 (S.D. Ohio Dec. 23, 2013). In that case, the same-sex couples had been legally married in states other than Ohio. Upon the death of their same-sex spouse, the surviving spouses sought recognition of those marriages on Ohio death certificates. *See id.* at *1. The *Obergefell* plaintiffs sued the "local and state officers responsible for death certificates." *Id.* While *Obergefell* does not stand for the proposition that local and state officials "responsible for death certificates" are the only types of officials who may be sued in a challenge to non-recognition laws, it does highlight the Barton couple's evidentiary deficiencies in this case. Unlike the plaintiffs in *Obergefell*, who attempted to obtain recognition on death certificates, the Barton couple has not taken any steps to obtain recognition and has not shown that Smith is the proper official. While the Court does not believe that a futile "trip to the courthouse" is required in every instance, the only evidence before the Court is an uncontroverted denial of any connection to the injury by the sued state official. Therefore, the Barton couple's challenge to Part B is dismissed for lack of standing.[18]

## V.    Bishop Couple Has Standing to Challenge Part A

Smith has not attacked the Bishop couple's standing to challenge Part A or raised any other jurisdictional deficiencies. Nonetheless, the Court has independently satisfied itself that standing and other jurisdictional requirements are satisfied. The Bishop couple has proven standing because they sought an Oklahoma marriage license from Smith, Smith denied them such license, and Smith did so based upon their status as a same-sex couple. Unlike with Part B, the Bishop couple has

---

[18]  This is an unfortunate result for the Barton couple, who have twice been turned away based on standing. However, the Court notes that Part B was not the focus of this litigation. It was unclear whether the Barton couple challenged Part B in the Amended Complaint, and they devoted only one page of argument to it in their motion for summary judgment. (*See* Pls.' Mot. for Summ. J. 41-42.) In a proper equal protection challenge, portions of this Court's analysis of Part A would also seem applicable to Part B. The Court is reminded of a quote by Harriet Beecher Stowe: "[N]ever give up, for that is just the place and time that the tide will turn." Harriet Beecher Stowe, *Old Town Folks* (1869).

clearly demonstrated Smith's connection to their injury.  Further, in contrast to Section 2 of DOMA, Part A of the Oklahoma Constitutional Amendment represents a significant cause of the Bishop couple's injury and, at a minimum, stands as a barrier between them and "married" legal status in Oklahoma.  A favorable ruling would enjoin enforcement of an enshrined definition of marriage in the Oklahoma Constitution and bring the Bishop couple substantially closer to their desired governmental benefit.  *See supra* Part II(B) (explaining that, in equal protection cases, a plaintiff need not show that a favorable ruling would relieve his every injury but must show that a favorable ruling would remove a barrier imposing unequal treatment).[19]

The Court has also satisfied itself that Smith is properly sued.  The Bishop couple may seek relief from Smith under *Ex parte Young*, 209 U.S. 123 (1908), which permits suits where a plaintiff is "(1) suing state officials rather than the state itself, (2) alleging an ongoing violation of federal law, and (3) seeking prospective relief."  *Cressman v. Thompson*, 719 F.3d 1139, 1146 (10th Cir. 2013); *see also Ky. Press Ass'n, Inc. v. Ky.*, 355 F. Supp. 2d 853, 861-62 (E.D. Ky. 2005) (applying *Ex Parte Young* doctrine to permit suit against court clerk in her official capacity).  The Court had additional immunity concerns based on *Bishop II*'s holding that Smith acts as an arm of Oklahoma's judiciary when she issues (or denies) marriage licenses.  *See Bishop II*, 2009 WL 1566802, at *3. However, because the suit is one for declaratory and injunctive relief, Smith is not entitled to judicial or quasi-judicial immunity.  *See Guiden v. Morrow*, 92 F. Appx. 663, 665 (10th Cir. 2004) (explaining that court clerk of Butler County, Kansas sued in her official capacity had quasi-judicial

---

[19]  As explained *supra* in footnote 2, there is an Oklahoma statute also impacting same-sex couples' eligibility for a marriage license.  *See* Okla. Stat. tit. 43, § 3(A).  No party discussed standing problems posed by this statute, and the Court is satisfied that enjoining enforcement of Part A redresses a concrete injury suffered by the Bishop couple.

immunity from suits for money damages but "would not be entitled to immunity in a suit seeking injunctive relief").

## VI.     Part A of the Oklahoma Constitutional Amendment Violates the U.S. Constitution

The Bishop couple argues that Part A is an unconstitutional deprivation of their fundamental due process liberties and equal protection rights under the Fourteenth Amendment to the U.S. Constitution.  The Bishop couple and Smith filed cross motions for summary judgment, and both parties urge the Court to decide the constitutionality of Part A as a matter of law.  The Court concludes: (1) *Baker v. Nelson* is not binding precedent; (2) *Windsor*'s reasoning does not mandate a particular outcome for the Bishop couple or Smith; and (3) Part A intentionally discriminates against same-sex couples desiring an Oklahoma marriage license without a legally sufficient justification.

### A.     *Baker v. Nelson*

Smith argues that *Baker* represents binding Supreme Court precedent and should end this Court's analysis of Part A.  In *Baker*, the Supreme Court dismissed, "for want of a substantial federal question," an appeal of the Minnesota Supreme Court's holding that its state marriage laws did not violate a same-sex couple's equal protection or substantive due process rights under the U.S. Constitution.  *Baker v. Nelson*, 409 U.S. 810 (1972).  This type of summary dismissal "for want of a substantial federal question," although without any reasoning, is considered a binding decision on the merits as to the "precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176-77 (1977); *Okla. Telecasters Ass'n v. Crisp*, 699 F.2d 490, 496 (10th Cir. 1983), *rev'd on other grounds*, *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984).[20]

---

[20] In 1972, the Supreme Court had "no discretion to refuse adjudication" of an appeal of a state court decision upholding a state statute against federal constitutional attack.  *See Hicks v.*

*Baker* presented the precise legal issues presented in this case – namely, whether a state law limiting marriage to opposite-sex couples violates due process or equal protection rights guaranteed by the U.S. Constitution.   This is evidenced by the jurisdictional statements submitted to the Supreme Court.   In relevant part, the appellants phrased the issues as whether Minnesota's "refusal to sanctify appellants' marriage deprives appellants of liberty and property in violation of the due process and equal protection clauses." (Appellants' Jurisdictional Statement, Ex. 4 to Smith's Cross Mot. for Summ. J.)  Appellees similarly phrased the relevant issues as "[w]hether appellee's refusal to sanctify appellants' marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment;" and "[w]hether appellee's refusal . . . to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment." (Appellees' Jurisdictional Statement, Ex. 4 to Smith's Cross Mot. for Summ. J.)[21]  Therefore, barring application of an exception, *Baker* is

_____

*Miranda*, 422 U.S. 332, 343-44 (1975) (explaining difference between this type of summary dismissal and a denial of certiorari).   Thus, despite its lack of reasoning, *Baker* is binding precedent as to issues squarely presented and dismissed.   Although *Hicks* remains the law, it has been criticized.   *See., e.g.*, Randy Beck, *Transtemporal Separation of Powers in the Law of Precedent*, 87 Notre Dame L. Rev. 1405, 1451 (2012) ("Just as we do not accord precedential weight to a denial of certiorari, the Court should abandon *Hicks* and deny controlling force to unexplained summary dispositions. . . . [T]he value of allowing thorough consideration of a legal question outweighs any enhanced legal stability that flows from requiring lower courts to decipher unexplained rulings and treat them as binding authority.").

[21]  At the trial court level, the same-sex couple had challenged a Minnesota county clerk's refusal to grant them a marriage license.   They argued that (1) same-sex marriage was authorized by Minnesota law, and (2) alternatively, denial of a marriage license deprived them of liberty without due process and equal protection in violation of their Fourteenth Amendment rights and constituted an unwarranted invasion of privacy in violation of the Ninth and Fourteenth Amendments.   *Baker v. Nelson*, 191 N.W.2d 185, 185 (Minn. 1971) (explaining arguments made in trial court).   The Minnesota Supreme Court held that (1) Minnesota's marriage statute, which did not expressly prohibit same-sex marriages, only authorized marriages between persons of the opposite sex; and (2) such an interpretation did not violate the plaintiffs' equal protection, due

binding precedent in this case.  *See Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1087 (D. Haw. 2012) (holding that Fourteenth Amendment challenge to Hawaii law limiting marriage to opposite-sex couples presented precise issues that had been presented in *Baker*); *see also Windsor v. United States* ("*Windsor I*"), 699 F.3d 169, 178 (2d Cir. 2012) (addressing DOMA challenge) (defining issue in *Baker* as "whether same-sex marriage may be constitutionally restricted by the states"); *In re Kandu*, 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (addressing DOMA challenge) ("The issue in *Baker* was whether a state licensing statute limiting marriage to opposite-sex couples, and thereby excluding same-sex marriage, violated the due process and equal protection provisions of the Constitution.").

There is an exception to the binding nature of summary dismissals, however, if "doctrinal developments indicate" that the Supreme Court would no longer brand a question as unsubstantial. *Hicks*, 422 U.S. at 344-45 (stating that "unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise").  The Court concludes that this exception applies for three reasons.  First, interpreting *Hicks*, the Tenth Circuit has pronounced that a "summary disposition is binding on the lower federal courts . . . until doctrinal developments *or* direct decisions by the Supreme Court indicate otherwise."  *Okla. Telecasters Ass'n*, 699 F.2d at 495 (emphasis added).  If an express overruling by the Supreme Court is the only type of "doctrinal development" that qualifies for the exception, the disjunctive "or" would cease to have meaning.

---

process, or privacy rights guaranteed by the U.S. Constitution.  *Id.* at 186-87.

Second, there have been significant doctrinal developments in Supreme Court jurisprudence since 1972 indicating that these issues would now present a substantial question. The Supreme Court has: (1) recognized a new form of heightened scrutiny and applied it to sex-based classifications, *see Craig v. Boren*, 429 U.S. 190, 197-98 (1976); (2) held that a Colorado constitutional amendment targeting homosexuals based upon animosity lacked a rational relation to any legitimate governmental purpose, *see Romer v. Evans*, 517 U.S. 620, 635 (1996); (3) held that homosexuals had a protected liberty interest in engaging in private, homosexual sex, that homosexuals' "moral and sexual choices" were entitled to constitutional protection, and that moral disapproval did not provide a legitimate justification for a Texas law criminalizing sodomy*, Lawrence v. Texas*, 539 U.S. 558, 564, 571 (2003); and (4) most recently, held that the U.S. Constitution prevented the federal government from treating state-sanctioned opposite-sex marriages differently than state-sanctioned same-sex marriages, and that such differentiation "demean[ed] the couple, whose moral and sexual choices the Constitution protects," *Windsor*, 133 S. Ct. at 2694. While none is directly on point as to the questions presented in *Baker* (or here), this is the type of erosion over time that renders a summary dismissal of no precedential value. It seems clear that what was once deemed an "unsubstantial" question in 1972 would now be deemed "substantial" based on intervening developments in Supreme Court law. *See Windsor I*, 699 F.3d at 178 (holding that *Baker* was not controlling as to constitutionality of DOMA, reasoning in part that "[i]n the forty years after *Baker*, there have been manifold changes to the Supreme Court's equal protection jurisprudence" that would warrant an exception to the general rule). *But see Mass. v. U.S. Dept. of Health and Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) (rejecting similar reasoning in DOMA challenge and indicating that *Baker* limited the arguments in that case).

33

Finally, although the Supreme Court's decision in *Windsor* was silent as to *Baker*'s impact,[22] statements made by the Justices indicate that lower courts should be applying *Windsor* (and not *Baker*) to the logical "next issue" of state prohibitions of same-sex marriage. *See Windsor*, 133 S. Ct. at 2696 (Roberts, C.J., dissenting ) (urging that the *Windsor* majority's reasoning must not be extended to state-law bans because the majority's "judgment is based on federalism"); *id.* at 2709-10 (Scalia, J., dissenting) (stating his opinion that the majority decision "arms well every challenger to a state law restricting marriage to its traditional definition") (explaining that "state and lower federal courts" will be able to distinguish *Windsor* due to its "scatter-shot rationales" and inviting lower courts to "distinguish away"). If *Baker* is binding, lower courts would have no reason to apply or distinguish *Windsor*, and all this judicial hand-wringing over how lower courts should apply *Windsor* would be superfluous. Accordingly, the Court concludes that *Baker* is no longer a binding summary dismissal as to those issues. *See Kitchen v. Herbert*, --- F. Supp. 2d ----, No. 2:13-cv-217, 2013 WL 6697874, at *8 (D. Utah Dec. 20, 2013) (reaching same conclusion in challenge to Utah's marriage definition in case issued after *Windsor*).[23]

---

[22] Based on the *Windsor I* decision, it seemed likely that the Supreme Court would address *Baker*'s precedential value. *See Windsor I*, 699 F.3d at 178-79 (majority concluding that "doctrinal changes constitute another reason why *Baker* does not foreclose our disposition of this case); *id.* at 195 n.3 (Straub, J., concurring in part and dissenting in part) (acknowledging that "questions may stop being 'insubstantial' when subsequent doctrinal developments so indicate" but concluding that Supreme Court decisions had not "eroded *Baker*'s foundations such that it no longer holds sway"). However, no Justice mentioned *Baker* in any part of the *Windsor* decision. At least one commentator criticized this silence. Jonah Horwitz, *When Too Little is Too Much: Why the Supreme Court Should Either Explain its Opinions or Keep Them to Itself*, 98 Minn. L. Rev. Headnotes 1, 2 (2013) (explaining that *Baker* was "examined in detail" in the Supreme Court briefs and criticizing Supreme Court for failing to discuss *Baker*) ("For a case of such length and significance, it is nothing short of amazing that no one refers, even in passing, to what struck the lower courts and the litigants as a potentially dispositive case.").

[23] Lower court decisions issued prior to *Windsor* are split as to the applicability of the doctrinal developments exception. *Compare, e.g., Jackson*, 884 F. Supp. 2d at 1085 (holding

## B.     *Windsor*'s Impact

In *Windsor*, the plaintiff, a New York resident, inherited the estate of her same-sex spouse. 133 S.Ct. at 2682.  The couple had entered into a Canadian marriage, which was recognized in New York at the time of her spouse's death.  *See id.* (citing *Windsor I*'s reasoning regarding New York's recognition of the Canadian marriage).[24]  Upon inheriting her spouse's estate, the plaintiff sought to claim the federal estate tax exemption but was prevented from doing so by Section 3 of DOMA, which defined marriage as between one and one woman for purposes of federal law.  *Id.*  The plaintiff paid the taxes and then filed suit to challenge the constitutionality of Section 3.  *Id.*

The *Windsor* majority opinion, authored by Justice Kennedy, held that: (1) when a state recognizes same-sex marriage, it confers upon this class of persons "a dignity and status of immense import;" *id.* at 2692; and (2) Section 3 of DOMA violated equal protection principles because the "avowed purpose and practical effect" of that law was "to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority" of a state, *id.* at 2693.  This Court interprets *Windsor* as an equal protection case holding that DOMA drew an unconstitutional line between lawfully married opposite-sex couples and lawfully married same-sex couples.  *See id.* at 2694. ("DOMA's principal effect is to identify a subset of state-sanctioned marriages and make them unequal.").

----

that the Supreme Court has not "explicitly or implicitly overturned its holding in *Baker* or provided the lower courts with any reason to believe that the holding is invalid") *with Smelt v. Cnty. of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal developments show it is not reasonable to conclude the questions presented in the *Baker* jurisdictional statement would still be viewed by the Supreme Court as 'unsubstantial.'"), *overr'd on other grounds*, *Smelt v. Cnty. of Orange*, 447 F.3d 673 (9th Cir. 2006).

[24]  The *Windsor I* court based its conclusion upon rulings by New York intermediate appellate courts, which indicated that the Canadian marriage was indeed recognized in New York when the plaintiff inherited her spouse's estate.  *Windsor I*, 699 F.3d at 177-78.

The *Windsor* Court did not apply the familiar equal protection framework, which inquires as to the applicable level of scrutiny and then analyzes the law's justifications. Instead, the *Windsor* Court based its conclusion on the law's blatant improper purpose and animus. *See id.* at 2693. The Court reasoned that DOMA's "unusual deviation" from the tradition of "accepting state definitions of marriage" was "strong evidence of a law having the purpose and effect of disapproval of the class." *Id.* The Court concluded, based upon DOMA's text and legislative history, that DOMA's principal purpose "was to impose inequality." *Id.* Thus, *Windsor* does not answer whether a state may prohibit same-sex marriage in the first instance. Nor does *Windsor* declare homosexuals a suspect class or discuss whether DOMA impacted a fundamental right, which would have provided this Court with a clear test for reviewing Part A.

Both parties argue that *Windsor* supports their position, and both are right. *Windsor* supports the Bishop couple's position because much of the majority's reasoning regarding the "purpose and effect" of DOMA can be readily applied to the purpose and effect of similar or identical state-law marriage definitions. *See id.* at 2693 (discussing "essence" of DOMA as "defending" a particular moral view of marriage, imposing inequality, and treating legal same-sex marriages as "second class," ultimately concluding that DOMA was motivated by an "intent to injure" lawfully married same-sex couples); *id.* at 2710 (Scalia, J., dissenting) (explaining that "the majority arms well every challenger to a state law restricting marriage to its traditional definition" and transposing certain portions of the majority opinion to reveal how it could assist these challengers). However, *Windsor*'s "purpose and effect" reasoning is not a perfect fit, as applied to Part A, because Part A does not negate or trump marital rights that had previously been extended to Oklahoma citizens. Further, DOMA's federal intrusion into state domestic policy is more

36

"unusual" than Oklahoma setting its own domestic policy. *See id.* at 2692 (discussing DOMA's departure from the tradition of "reliance on state law to define marriage").

*Windsor* supports Smith's position because it engages in a lengthy discussion of states' authority to define and regulate marriage, which can be construed as a yellow light cautioning against *Windsor*'s extension to similar state definitions. *See id.* at 2692 (explaining that state marriage laws vary between states and discussing states' interest in "defining and regulating the marital relation"). Again, however, the "yellow light" argument has its limitations. In discussing this traditional state authority over marriage, the Supreme Court repeatedly used the disclaimer "subject to constitutional guarantees." *See id.* at 2692 (citing *Loving v. Virginia*, 388 U.S. 1 (1967) (holding that Virginia's prohibition of interracial marriage violated equal protection and substantive due rights)). A citation to *Loving* is a disclaimer of enormous proportion. Arguably, the "state rights" portion of the *Windsor* decision stands for the unremarkable proposition that a state has broad authority to regulate marriage, so long as it does not violate its citizens' federal constitutional rights. New York had expanded its citizens' rights, and there was no possible constitutional deprivation in play.

This Court has gleaned and will apply two principles from *Windsor*. First, a state law defining marriage is not an "unusual deviation" from the state/federal balance, such that its mere existence provides "strong evidence" of improper purpose. A state definition must be approached differently, and with more caution, than the Supreme Court approached DOMA. Second, courts reviewing marriage regulations, by *either* the state or federal government, must be wary of whether "defending" traditional marriage is a guise for impermissible discrimination against same-sex

couples.  These two principles are not contradictory, but they happen to help different sides of the same-sex marriage debate.

### C.    Civil Marriage in Oklahoma

Before reaching its equal protection analysis, some preliminary discussion of civil marriage in Oklahoma is necessary.  In order to enter into a marital contract, *see* Okla. Stat. tit. 43, § 1 (explaining that marriage is a "personal relation arising out of a civil contract"), a couple must first obtain a marriage license from the "judge or clerk of the district court, of some county in this state, authorizing the marriage between the persons named in such license."  Okla. Stat. tit. 43, § 4.  In order to qualify for a marriage license, a couple must have the following characteristics: (1) the parties must be "legally competent of contracting," *id.* § 1; (2) each person must be "unmarried," *see id.* § 3(A); (3) the couple must consist of "one man and one woman," *see* Okla. Const. art. 2, § 35(A); *see also* Okla. Stat. tit. 43, § 3(A) (indicating that marital contract must be entered "with a person of the opposite sex"); (4) both parties must be eighteen years of age, *see* Okla. Stat. tit. 43, § 3(A);[25] and (5) the couple must not be related to one another in certain ways, *see id.* § 2.[26]  But for the Bishop couple's status as a same-sex couple, they satisfy the other eligibility criteria for obtaining a marriage license.

The process of obtaining a marriage license requires the couple to "submit an application in writing signed and sworn to in person before the clerk of the district court by both of the parties

---

[25]  Oklahoma permits persons between the ages of sixteen and eighteen to marry with parental consent, *see id.* § 3(B)(1)(a)-(f), and persons under sixteen to marry if authorized by the court in very limited circumstances, *see id.* § 3(B)(2).

[26]  Marriages between "ancestors and descendants of any degree, of a stepfather with a stepdaughter, stepmother with stepson, between uncles and nieces, aunts and nephews, except in cases where such relationship is only by marriage, between brothers and sisters of the half as well as the whole blood, [or] first cousins" are prohibited.  Okla. Stat. tit. 43, § 2.

setting forth" certain information.  *Id.* § 5(A).  If the court clerk is satisfied with the couples' application and the couple pays the appropriate fee, the clerk "shall issue the marriage license authorizing the marriage and a marriage certificate."  Okla. Stat. tit. 43, § 5(B)(1).  The "marriage certificate" is a document with "appropriate wording and blanks to be completed and endorsed . . . by the person solemnizing or performing the marriage ceremony, the witnesses, and the persons who have been married."  *Id.* § 6(A)(6).

The couple may then choose how they will "solemnize" the marriage, which is when the parties enter into the marital contract:

> All marriages must be contracted by a formal ceremony performed or solemnized in the presence of at least two adult, competent persons as witnesses, by a judge or retired judge of any court in this state, or an ordained or authorized preacher or minister of the Gospel, priest or other ecclesiastical dignitary of any denomination who has been duly ordained or authorized by the church to which he or she belongs to preach the Gospel, or a rabbi and who is at least eighteen (18) years of age.

Id. § 7(A).  The judge, minister, or other authorized person must have possession of the marriage license and must have good reason to believe that the persons presenting themselves for marriage are the individuals named in the license.  *Id.* § 7(C).  Marriages between persons belonging to certain religions – namely, "Friends, or Quakers, the spiritual assembly of the Baha'is, or the Church of Jesus Christ of Latter Day Saints, which have no ordained minister" – may be "solemnized by the persons and in the manner prescribed by and practiced in any such society, church, or assembly." *Id.* § 7(D).  Following the ceremony, whether civil or religious, the officiant, witnesses, and parties must complete and sign the marriage certificate.  *See id.* § 8(A)-(C).  Any person who performs or solemnizes a marriage ceremony "contrary to any of the provisions of this chapter" is guilty of a misdemeanor.  *See id.* § 15.

39

After the license is issued and the contract entered into (either by civil or religious ceremony), both the marriage license and the marriage certificate are then returned to the court clerk who issued the license and certification. *See id.* § 8(D). This must be completed within thirty days of issuance of the marriage license. *Id.* § 6(A)(5). Once returned, the court clerk makes "a complete record of the application, license, and certificate" and then returns the original license to the applicants, "with the issuing officer's certificate affixed thereon showing the book and page or case number where the same has been recorded." *Id.* § 9.[27]

Therefore, in Oklahoma, "marriage" is a three-step process consisting of: (1) applying for and receiving a marriage license from the court clerk, which authorizes the couple to then enter the marital contract; (2) entering the marital contract by civil or religious ceremony; and (3) having the marriage license and marriage certificate "recorded" by the court clerk. This Court's equal protection analysis is limited to Part A's alleged discriminatory treatment with respect to the first and third steps – namely, Part A's prevention of Smith from issuing a marriage license to same-sex couples and then recording the license upon its return.[28] Smith has no connection to the second step (solemnization), and this Court's equal protection analysis does not impact the second step.

---

[27]   Unlike some other states, Oklahoma does not offer any alternative scheme for same-sex couples, such as civil unions. The Supreme Court has stated, and this Court firmly agrees, that "marriage is more than a routine classification for purposes of certain statutory benefits." *Windsor*, 133 S.Ct. at 2692. This Court's opinion should not be read to mean that marriage is *nothing more* than a contractual relationship or to mean that a civil union scheme would survive constitutional scrutiny. However, because Oklahoma is an all-or-nothing state (marriage license or no marital benefits), the equal protection violation is that much clearer, and this Court's opinion need not reach the legal viability of some alternative scheme.

[28]   When the Court refers to "obtaining a marriage license" throughout this Order, it refers to both the initial issuance of the marriage license and the recording of the marriage license by the court clerk after the marriage is solemnized.

Therefore, the declaratory and injunctive relief granted by the Court does not require any individual to perform a same-sex marriage ceremony.

> ### D.    Equal Protection Analysis

The Fourteenth Amendment mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Tenth Circuit has recently explained equal protection principles:

> Equal protection is the law's keystone. Without careful attention to equal protection's demands, the integrity of surrounding law all too often erodes, sometimes to the point where it becomes little more than a tool of majoritarian oppression. But when equal protection's demands are met, when majorities are forced to abide the same rules they seek to impose on minorities, we can rest much surer of the soundness of our legal edifice. No better measure exists to assure that laws will be just than to require that laws be equal in operation.
>
> At the same time, it is of course important to be precise about what equal protection is and what it is not. *Equal protection of the laws doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations—two possibilities that might themselves generate rather than prevent injustice.* Neither is the equal protection promise some generic guard against arbitrary or unlawful governmental action, merely replicating the work done by the Due Process Clause or even the Administrative Procedure Act. *Instead, the Equal Protection Clause is a more particular and profound recognition of the essential and radical equality of all human beings. It seeks to ensure that any classifications the law makes are made without respect to persons, that like cases are treated alike, that those who appear similarly situated are not treated differently without, at the very least, a rational reason for the difference.*

*SECSYS, LLC v. Vigil*, 666 F.3d 678, 684-85 (10th Cir. 2012) (alterations and citations omitted) (emphases added). A class-based equal-protection challenge, such as that raised here, generally requires a two-step analysis. *Id.* at 685. First, the Court asks "whether the challenged state action intentionally discriminates between groups of persons." *Id.* Second, after an act of intentional discrimination is identified, the Court must ask "whether the state's intentional decision to discriminate can be justified by reference to some upright government purpose." *Id.* at 686. In

41

conducting its analysis, the Court has been particularly mindful of the above-quoted portion of *Vigil* and has closely adhered to its two-step test. This has helped the Court decide this controversial and complex case as it would decide any other equal protection challenge.

### 1. Does Part A Intentionally Discriminate Between Groups of Persons?

"Intentional discrimination can take several forms." *Vigil*, 666 F.3d at 685. "When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of legislative purpose is required." *Id.* If the law is instead one of general applicability, some "proof is required." *Id.* Because "few are anxious to own up to a discriminatory intent," courts may "draw inferences about a law's intent or purpose from circumstantial evidence." *Id.* at 686. A plaintiff may demonstrate that a generally applicable law results in intentional discrimination by showing that the law "was adopted at least in part because of, *and not merely in spite of*, its discriminatory effect on a particular class of persons." *Id.* (emphasis added).

The Court defines the relevant class as same-sex couples desiring an Oklahoma marriage license.[29] The Bishop couple has easily satisfied the first element – requiring a showing that Part A intentionally discriminates against this class – for two reasons. First, Part A's disparate impact upon same-sex couples desiring to marry is stark. Its effect is to prevent every same-sex couple in Oklahoma from receiving a marriage license, and no other couple. This is not a case where the law

---

[29] It is somewhat unusual to define a class of couples, but the Court finds it proper here. The classification made by Part A is aimed only at same-sex couples who want to marry, rather than all homosexuals. A couple must apply together in person for a marriage license, and it is the fact that they are of the same sex that renders them ineligible. Further, Smith's preferred justifications are tied to alleged characteristics that two individuals have when coupled – *i.e.*, their inability to "naturally procreate" and to provide an "optimal" parenting environment. *See infra* Part VI(D)(2)(d) (setting forth Smith's preferred justifications for the law).

has a small or incidental effect on the defined class; it is a total exclusion of only one group.  *See Vigil*, 666 F.3d at 686 (explaining that a law's starkly disparate impact "may well inform a court's investigation into the law's underlying intent or purpose").

Second, both the timing of SQ 711 in relation to certain court rulings and the statements in the public domain before passage of SQ 711 raise the inference that it was adopted, at least in part, for the purpose of excluding the class from marriage.  SQ 711 originated from legislation entitled the Marriage Protection Amendment, which passed the Oklahoma Legislature as part of House Bill 2259 ("HB 2259").  (*See* Smith's Cross Mot. for Summ. J., Ex. 1 to Ex. B.)  Although there is no "legislative history" for HB 2259 cited in the record, the Oklahoma House of Representatives website provides a "history" of HB 2259, which (1) lists the title as "Marriage; enacting the Marriage Protection Amendment;" (2) shows that the Oklahoma Senate passed the measure by a vote of 38 to 7 on April 15, 2004; and (3) shows that the House passed the measure by a vote of 92 to 4 on April 22, 2004.  *See* History for HB 2259, *available at* www.oklegislature .gov/BillInfo.aspx?Bill= HB2259&Session=0400.[30]

On April 15, 2004, the day HB 2259 passed the Oklahoma Senate, the Oklahoma Senate issued the following press release:

> Senate Passes Marriage Protection Amendment
>
> Despite efforts by the Democrat leadership throughout the legislative session to kill the issue, the Senate passed a bill that sends to a vote of the people a constitutional amendment defining marriage in Oklahoma as only between one man and one

---

[30]  The Court takes judicial notice of information available on the Oklahoma House of Representatives website and the Oklahoma Senate website pursuant to Federal Rule of Evidence 201, which allows courts to take judicial notice of adjudicative facts if they are "generally known within the trial court's jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be questioned." Fed. R. Evid. 201(b); *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012).

woman and prohibiting the state from recognizing homosexual marriages performed outside Oklahoma.

"I am thankful to the Senate's Democrat leadership for finally giving up on their efforts to keep the people from voting on the marriage protection amendment," stated Senate Republican Leader James Williamson, R-Tulsa. "All we wanted all along was for the Democrat leadership to allow an up or down vote on this issue, and to allow the Senate to work its will.

"This is a tremendous victory for the people of Oklahoma and for those of us here at the state Capitol who fight for pro-family issues," Williamson said.

Today's vote was allowed as the result of an agreement on Tuesday between the Senate Democrat leadership and the Senate Republicans to end a filibuster by Senator Bernest Cain, D-Oklahoma City, the Senate's leading supporter of legalizing homosexual marriage in Oklahoma.
. . .
Today, Williamson succeeded in attaching the marriage protection amendment to House Bill 2259 . . ., sending it back to the House of Representatives for their approval of the Senate's amendment to the bill.
. . .
If HB 2259 becomes law, the people of Oklahoma will vote on the proposed constitutional amendment on this fall's general election ballot. The constitutional amendment would define marriage as only between one man and one woman, prohibit the recognition of same-sex marriages in other jurisdictions, and make it a misdemeanor to issue a marriage license in violation of the amendment's definition of marriage.

Many other states – from Ohio to Georgia – have taken action *to provide constitutional protections to traditional marriage to combat efforts by liberals and activist judges seeking to redefine marriage by allowing same-sex unions*.

*Senate Passes Marriage Protection Amendment*, *available at* www.oksenate.gov/news/press-

releases/press_releases_2004/pr20040415.html (emphasis added).

The press release's reference to judicial efforts to redefine marriage by allowing "same-sex

unions" came shortly after two Massachusetts Supreme Court cases were issued, which held that the

Massachusetts Constitution required that state to allow same-sex marriage.  *See Goodridge v. Dept.*

*of Pub. Health*, 798 N.E.2d 941, 968 (Mass. Dec. 20, 2003) (holding that practice of denying

marriage licenses to same-sex couples violated same-sex couples' equal protection rights under Massachusetts Constitution); *In re Opinions of the Justices to the Senate*, 802 N.E.2d 565, 572 (Mass. Feb. 3, 2004) (providing opinion, in response to question from Massachusetts Senate, that a bill prohibiting same-sex couples from marrying, but allowing same-sex couples to enter civil unions, would also violate the Massachusetts Constitution).  On February 6, 2004, three days after the second ruling by the Massachusetts Supreme Court, Tulsa and Oklahoma City newspapers both reported that State Senator James Williamson, author of the Marriage Protection Amendment, made public statements regarding the need for a constitutional amendment in order to prevent a similar ruling in Oklahoma.  *See* Marie Price, *Republican Legislators Wary of Same-Sex Ruling*, Tulsa World, Feb. 6, 2004 ("Legislative Republicans said Thursday that this week's Massachusetts Supreme Court ruling outlining constitutional protection for same-sex marriages puts Oklahoma in jeopardy of a similar decision.") (quoting Mr. Williamson as stating that "'[Governor Brad Henry's] reluctance to protect traditional marriage could put Oklahoma at risk that a court will force same-sex unions on us here'");[31] Ryan McNeil, *Party Leaders Trade Barbs on Marriage*, The Oklahoman,

---

[31]  The Bishop couple presented several newspaper articles in support of their Statement of Facts 13-15.  (*See* Ex. 5 to Pls.' Mot. for Summ. J.)  Smith does not dispute the factual accuracy of the reporting in these articles but argues that they may not be considered because they are: (1) irrelevant, and (2) inadmissible hearsay.  The Court rejects both arguments.

First, the articles are relevant to both steps of the analysis – whether the law was passed, at least in part, for the purpose of intentional discrimination and whether such discrimination is justified.  *See Vigil*, 666 F.3d at 685 (setting forth two-step test); *see generally Windsor*, 133 S. Ct. at 2693 (discussing statements made by legislators supporting DOMA's passage as relevant to question of law's purpose).  Although the Court is addressing a constitutional amendment enacted by a vote of the people, public statements made by the drafting and championing legislators before the law's passage are certainly relevant evidence.

Second, the articles do not pose hearsay problems because the Court is not relying upon the articles, or quotations therein, for their truth.  The Court is relying upon the articles to demonstrate what information was in the public domain at the time SQ 711 passed.  Whether the

Feb. 6, 2004 (similarly reporting on Mr. Williamson's public comments regarding "activist judges" who seek to overturn Oklahoma's definition of marriage). Similar public comments regarding the need to protect marriage from same-sex couples were made closer in time to the law's passage. In a public debate held at the Tulsa Press Club between Mr. Williamson and Mark Bonney in October 2004, Mr. Williamson stated that "'[i]t is one thing to tolerate the homosexual lifestyle and another to legitimize it through marriage.'" Brian Barber, *Ban on Gay Marriage Debated*, Tulsa World, (Oct. 13, 2004) (quoting Mr. Williamson).

Exclusion of the defined class was not a hidden or ulterior motive; it was consistently communicated to Oklahoma citizens as a justification for SQ 711. This is simply not a case where

_____

articles or quotations are accurate is of no moment; what matters is that these justifications were offered to the voting public. *See Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (relying on articles for purposes of determining what was in the public realm, not whether the contents were in fact true); *Florida Right to Life, Inc. v. Mortham*, No. 98770CIVORL19A, 1998 WL 1735137, at *6 (M.D. Fla. Sept. 30, 1998) (finding news articles non-hearsay) ("[T]he Court will consider the effect of the newspaper articles in creating a perception by the public of corruption occurring in Florida, which perception depends on the fact that members of the public have read the articles rather than the truth of the matters contained therein."). One important source of public knowledge and opinion are news articles conveying statements by the legislators who originated, drafted, and promoted SQ 711.

Alternatively, the Court finds that all news articles and quotations therein qualify for the residual exception to the hearsay rule because: (1) the articles and quotations have circumstantial guarantees of trustworthiness – namely, that they were made publically to large groups, were consistently reported in Oklahoma newspapers, and are, in some ways, akin to statements against interest; (2) the articles and quotations are relevant to ascertaining the purposes and justifications for the law; (3) based on the lack of "legislative history" for a state question, the articles and quotations are more probative than other evidence that can be obtained through reasonable efforts; and (4) admitting the news articles, rather than requiring other forms of evidence, serves the interest of justice. *See* Fed. R. Evid. 807(1)-(4); *cf. New England Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650 (10th Cir. 1989) (finding that trial court properly excluded news article reporting statements made by widow to one reporter that she conspired to kill insured, where issue was fraudulent procurement of the insurance policy). Further, Smith does not dispute or attempt to dispute their factual veracity in any manner; Smith just asks the Court to disregard them. That does not serve the interest of justice in this case.

exclusion of same-sex couples was a mere "unintended consequence" of the law. *Cf. Vigil*, 666 F.3d at 686-87 (holding that any discriminatory impact on a certain class of persons by an extortionist state action was an "unintended consequence" flowing from the ultimate goal of enriching the extortioner). Instead, this is a classic, class-based equal protection case in which a line was purposefully drawn between two groups of Oklahoma citizens – same-sex couples desiring an Oklahoma marriage license and opposite-sex couples desiring an Oklahoma marriage license.[32]

### 2.     Is This Intentional Discrimination Justified?

Not all intentional discrimination by a state against a class of citizens violates equal protection principles. *See Vigil*, 666 F.3d at 686 ("The law . . . may take cognizance of *meaningful* distinctions between individuals without violating the constitutional command of treating similarly situated persons equally."). "In determining whether distinctions between individuals are 'meaningful,' the degree of judicial scrutiny varies." *Id.* If the discrimination is against a suspect class or quasi-suspect class, it comes to courts "under grave suspicions and subject to heightened review" because experience teaches that classifications against these groups is "so rarely defensible on any ground other than a wish to harm and subjugate." *Id.* at 687. "Laws selectively burdening

---

[32] In some equal protection cases, the intentional discrimination imposed by the law is so "unusual" in its character that improper purpose and motive are readily apparent, and there is no need to determine whether the intentional discrimination is justified. *See, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S. at 635. Because *Windsor* involved an unusual federal intrusion into state domestic law (not at issue here) and *Romer* involved an unusual, total removal of any equal protection of the law (not at issue here), the Court proceeds to conduct a more traditional equal protection analysis by determining the proper level of scrutiny and then considering all conceivable justifications for Part A. *See generally Kitchen*, 2013 WL 6697874, at *22 (discussing lack of guidance for determining whether a law imposes "discrimination of an unusual character" and applying "well-settled rational basis test" to Utah's same-sex marriage prohibition).

fundamental rights are also carefully scrutinized."[33]  Laws discriminating against all other groups

---

[33]  The Court does not reach the question of whether Part A selectively burdens the Bishop couple's asserted fundamental "right to marry a person of their choice." (*See* Pls.' Reply in Support of Pls.' Mot. for Summ. J. 14.)  Such a holding would be broader than whether Part A intentionally discriminates against a defined class of Oklahoma citizens, and it would possibly affect other Oklahoma laws burdening the "right to marry a person of [one's] choice."  *See supra* Part VI(C) (setting forth age, number, and other eligibility requirements under Oklahoma law).  If Part A does burden a fundamental right, it certainly would not withstand any degree of heightened scrutiny.  *See supra* Part VI(D)(2)(d).

Based upon its research on this topic, the Court offers two observations.  First, whether or not the right in question is deemed fundamental turns in large part upon how the right is defined.  If the right is defined as the "right to marry," plaintiffs have thus far been more likely to win the argument.  *See, e.g.*, *Kitchen*, 2013 WL 6697874, at *15 (holding that the plaintiffs do not "seek a new right to same-sex marriage" and that "the right to marry has already been established as a fundamental right"); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 994-95 (N.D. Cal. 2010) ("Because plaintiffs seek to exercise their fundamental right to marry, their claim is subject to strict scrutiny."); *Goodridge*, 798 N.E. 2d at 959-61 (Mass. 2003) (stating in dicta that "[w]hether and whom to marry . . . [is] among the most basic of every individual's liberty and due process rights" but then failing to decide whether the case merited strict scrutiny because the law did not pass rational basis review); *Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012) (stating in dicta that the right burdened by Section 3 of DOMA was the fundamental "right to marry," which had never been limited based upon the status of the desired spouse).  If defined as the "right to marry a person of the same sex," plaintiffs have thus far been more likely to lose the argument.  *See, e.g.*, *Jackson*, 884 F. Supp. 2d at 1096 (defining right burdened as "an asserted new right to same-sex marriage" and holding that such right was not deeply rooted in the nation's tradition) (collecting cases); *Lewis v. Harris*, 188 N.J. 415, 441 (2006) (defining right burdened as the "right to same-sex marriage" and holding that "[d]espite the rich diversity of this State . . . and the many recent advances made by gays and lesbians . . ., we cannot find that a right to same-sex marriage is so deeply rooted in the traditions, history, and conscience of the people of this State that it ranks as a fundamental right" under the New Jersey Constitution).

Second, language in *Windsor* indicates that same-sex marriage may be a "new" right, rather than one subsumed within the Court's prior "right to marry" cases.

> It seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage. *For marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization. . . . The limitation of lawful marriage to heterosexual couples, which for centuries had been deemed both necessary and*

of citizens "are reviewed to see if the distinctions they draw between persons are at least rational" because "there is less reason from historical perspective to suspect a meaningless classification." *Id.*

### a.      Level of Scrutiny

The Bishop couple argues that Part A is subject to heightened scrutiny because it constitutes gender discrimination.  As explained above, the Court's defined class is same-sex couples desiring an Oklahoma marriage license.  This class of individuals is excluded from marriage regardless of their gender, *i.e.*, regardless of whether they are two men or two women.  Part A does not draw any distinctions between same-sex male couples and same-sex female couples, does not place any disproportionate burdens on men and women, and does not draw upon stereotypes applicable only to male or female couples.  The female couples in this case could readily be substituted for male couples, and the male couples would be forced to make precisely the same "sex discrimination" arguments.  Common sense dictates that the intentional discrimination occurring in this case has nothing to do with gender-based prejudice or stereotypes, and the law cannot be subject to heightened scrutiny on that basis.  *See Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1005 (D. Nev. 2012) (holding that Nevada's prohibition of same-sex marriage was not "directed toward persons of any particular gender" and did not "affect people of any particular gender disproportionately such that a gender-based animus [could] reasonably be perceived"); *Jackson*, 884 F. Supp. 2d at 1099 ("The Court thus agrees with the vast majority of courts considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination.") (citing cases).  *But see Kitchen,*

---

*fundamental*, came to be seen in New York and certain other States as an unjust exclusion.

*Windsor*, 133 S. Ct. at 2689 (emphases added).

2013 WL 6697874, at *20 (finding that Utah's marriage definition constituted sex discrimination and sexual orientation discrimination); *Perry*, 704 F. Supp. 2d at 996 ("Sexual orientation discrimination can take the form of sex discrimination."); *Golinski*, 824 F. Supp. 2d at 982 n.4 ("Ms. Golinski is prohibited from marrying . . . a woman because [she] is a woman. . . . Thus, DOMA operates to restrict Ms. Golinski's access to federal benefits because of her sex.").

Instead of gender-based discrimination, the intentional discrimination occurring against same-sex couples as a result of Part A is best described as sexual-orientation discrimination. The conduct targeted by Part A – same-sex marriage – is so closely correlated with being homosexual that sexual orientation provides the best descriptor for the class-based distinction being drawn. *See Lawrence*, 539 U.S. at 583 (O'Connor, J., concurring) (explaining that conduct targeted by Texas law criminalizing sodomy was so "closely correlated with being homosexual" that it amounted to a class-based distinction); *Sandoval*, 911 F. Supp. 2d at 1005 (concluding that Nevada law prohibiting same-sex marriage was "sexual-orientation based"); *Varnum v. Brien*, 763 N.W.2d 862, 885 (Iowa 2009) ("The benefit denied by the marriage statute – the status of civil marriage for same-sex couples – is so 'closely correlated with being homosexual' as to make it apparent the law is targeted at gay and lesbian people as a class."). In this case, the Bishop couple self-identifies as a homosexual couple and desires to marry each other due to their sexual orientation. (*See* Bishop Couple Aff. ¶ 14, Ex. 1 to Pls.' Mot. for Summ. J. (explaining that they "deeply desire" to marry the "person [they] love and the "companion [they] have chosen," which is driven by their sexual orientation as lesbian).)[34]   Classifications against homosexuals and/or classifications based on a

---

[34]   Smith does not dispute that "sexual orientation" is the best descriptor for the classification. Smith argues only that: (1) the Court should reject any attempt to "bootstrap" a sex discrimination claim to what is actually a sexual orientation discrimination claim, and (2) sexual orientation discrimination is subject to rationality review. (*See* Smith's Cross Mot. for

person's sexual orientation are not subject to any form of heightened review in the Tenth Circuit. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113-14 (10th Cir. 2008) ("A government official can, therefore, distinguish between its citizens on the basis of sexual orientation, if that classification bears a rational relation to some legitimate end.") (citation omitted) (holding that county sheriff's refusal to enforce a lesbian's protective order against her same-sex partner did not implicate any protected class that would warrant heightened scrutiny); *see also id.* n.9 (noting cases rejecting "the notion that homosexuality is a suspect classification"); *Kitchen*, 2013 WL 6697874, at \*21 (finding *Price-Cornelison* controlling as to this question in the Tenth Circuit). Therefore, Part A is not subject to any form of heightened scrutiny based upon the Bishop couple's membership in a suspect class.

### b.      Rationality Standard

Because it disadvantages a non-suspect class, Part A does not come to this Court under heightened suspicion.[35] It comes to the Court on the same footing, for example, as laws intentionally discriminating against the disabled or the elderly. Part A must be reviewed merely for "rationality," which requires the Court to uphold Part A "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" that it draws between citizens. *Copelin-Brown v. N.M. State Personnel Office*, 399 F.3d 1248, 1255 (10th Cir. 2005) (applying rational basis review to legislation discriminating against non-suspect class of disabled persons); *see also Price-Cornelison*, 524 F.3d at 1114 (inquiring whether classification based on the plaintiff's status as a

---

Summ. J. 19-25.)

[35]   This distinguishes this case from *Loving*, in which the Supreme Court analyzed Virginia's miscegenation law under the "most rigid scrutiny" applicable to racial classifications. *See Loving*, 388 U.S. at 11.

homosexual bore a "rational relation to some legitimate end").  In conducting its review, the Court must not only consider the actual purpose of the law but also whether there are any other justifications that could "conceivably" provide a rational reason for its passage.  *See Schanzenbach v. Town of Opal, Wyo.*, 706 F.3d 1269, 1276 (10th Cir. 2013) (explaining that a preferred justification for a law need not have actually motivated the legislature).  Further, "there need not be a perfect fit between purpose and achievement for a law to pass constitutional muster."  *Id.*  There is no difference in the rationality standard where the law in question is a state constitutional amendment enacted by a vote of citizens.  *See Romer*, 517 U.S. at 631 (concluding that Colorado constitutional amendment did not bear a "rational relation to a legitimate end").

The Court's ultimate task, even under rationality review, is to determine "whether there is some ground of difference having a fair and substantial relation to at least one of the stated purposes justifying the different treatment" between the included class and the excluded class.  *Johnson v. Robison*, 415 U.S. 361, 376 (1974); *see also Vigil*, 666 F.3d at 687 ("In any case, though, and whatever the applicable standard of review, the aim is always to ensure that, while persons in dissimilar situations may be treated differently, the law treats like alike.").  A state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985).  "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [a court] ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."  *Romer*, 517 U.S. at 634-35.

c.      **Promoting Morality**

The Court turns now to the conceivable justifications for Part A's preclusion of same-sex couples from receiving an Oklahoma marriage license.  Although not advanced in this litigation as a "justification," the Bishop couple has shown, as a matter of law, that promoting or upholding morality was at least one justification offered to the public prior to passage of the law.[36]  Just like federal legislators who stated their purpose as "defending" the morality of marriage, *see Windsor*, 133 S. Ct. at 2693, Oklahoma legislators promoted Part A as upholding one specific moral view of marriage.  In February 2004, prior to HB 2259's passage, House Minority Floor Leader Todd Hiett stated that "'[t]o recognize something other than what God has ordained as traditional marriage obviously detracts or deteriorates the importance of the traditional marriage.'"  Marie Price*, Republican Legislators Wary of Same-Sex Ruling*, Tulsa World, Feb. 6, 2004 (quoting Mr. Hiett).  State Representative Bill Graves said, "'This is a Bible Belt state . . . . Most people don't want that sort of thing here. . . . Gay people might call it discrimination, but I call it upholding morality.'"  David Harper, *Focus: Gay Marriage Clamor Grows Louder and Louder*, Tulsa World, Mar. 22, 2004 (quoting Mr. Graves).  On April 15, 2004, the date HB 2259 passed the Senate, Mr. Williamson stated that Oklahoma should not "'legitimize that lifestyle by saying, 'Yes, two homosexuals can be just as married as two heterosexuals.' That's not right.'"  John Greiner, *Marriage Vote Gets Backing of Senate*, The Oklahoman, Apr. 16, 2004, at 5A (quoting Mr. Williamson).  On or around May 11, 2004, commenting on an advertisement paid for by Cimarron Equality Oklahoma against SQ 711, Mr. Williamson stated that "'there is a real hunger for a return

---

[36]  This is a different question than the threshold question of whether the Bishop couple has shown intentional discrimination between groups, *see supra* Part VI(D)(1), although the analyses overlap somewhat in this case.

to traditional values and for leaders who will draw a line in the sand to help stop the moral decay of this country.'"   Judy Gibbs Robinson, *Group Fights Marriage Plan With Print Ad*, The Oklahoman, May 11, 2004, 1A (quoting Mr. Williamson).

In August of 2004, approximately two months before the public vote, over forty Tulsa-area churches organized a "pro-marriage rally," during which Mr. Williamson promoted passage of SQ 711 and discussed Biblical prohibitions of homosexual acts.  Robert Evatt*, Local "Pro-Marriage Rally" Takes Aim at Same-Sex Unions*, Tulsa World, Aug. 25, 2004 ("'As Christians, we are called to love homosexuals," Williamson said. "But I hope everyone at this rally knows the Scriptures prohibit homosexual acts."').  At this same rally, Tulsa Mayor Bill LaFortune stated: "'If you believe in Christ, if you believe in this country, and if you believe in this city, you believe that marriage is a covenant between God, a man, and a woman.'"   *Id.* (quoting Mr. LaFortune).  An editorial that ran in *The Oklahoman* on October 17, 2004 urged Oklahomans to pass SQ 711 because "the idea that marriage is between a man and a woman is consistent with the citizenry's morals and beliefs."   *Defining Marriage*, The Oklahoman, Oct. 17, 2004, at 22A.  The Bishop couple has shown, as a matter of law, that "moral disapproval of same-sex marriage" existed in the public domain as at least one justification for voting in favor of SQ 711.

The Court recognizes that moral disapproval often stems from deeply held religious convictions.  *See Lawrence*, 539 U.S. at 571 (explaining that moral disapproval of homosexual conduct was shaped by "religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family").  However, moral disapproval of homosexuals as a class, or same-sex marriage as a practice, is not a permissible justification for a law.  *See Lawrence*, 539 U.S. at 577 ("'[T]he fact that the governing majority in a State has traditionally viewed a particular practice as

immoral is not a sufficient reason for upholding a law prohibiting the practice.'") (quoting and

adopting Justice Stevens' dissent in *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986)) (concluding that

"the majority may [not] use the power of the State to enforce [moral] views [disapproving of

homosexual conduct] on the whole society through operation of the criminal law"); *id.* at 582-83

(O'Connor, J., concurring) (explaining that "moral disapproval, without any other asserted state

interest," is not a "sufficient rationale . . . to justify a law that discriminates among groups of

persons"); *Mass. v. United States Dept. of Health and Human Servs.*, 682 F.3d 1, 15 (1st Cir. 2012)

("*Lawrence* ruled that moral disapproval alone cannot justify legislation discriminating on that basis.

Moral judgments can hardly be avoided in legislation, but *Lawrence* and *Romer* have undercut this

basis.") (internal citations omitted).[37]   Preclusion of "moral disapproval" as a permissible basis for

laws aimed at homosexual conduct or homosexuals represents a victory for same-sex marriage

advocates, and it forces states to demonstrate that their laws rationally further goals other than

promotion of one moral view of marriage.   Therefore, although Part A rationally promotes the

State's interest in upholding one particular moral definition of marriage, this is not a permissible

justification.

### d.   Other Justifications

The Court must also consider whether Part A rationally relates to the state interests now

being offered by Smith in this litigation.[38]   Smith asserts four justifications for Part A's

---

[37]   Justice Scalia has repeatedly expressed his disagreement with this conclusion.  *See Windsor*, 133 S. Ct. at 2707 (Scalia, J., dissenting) ("As I have observed before, the Constitution does not forbid the government to enforce traditional moral and sexual norms. . . .").   However, these are dissenting opinions.

[38]   At the time of her concurrence in *Lawrence*, Justice O'Connor believed that "reasons exist," other than moral disapproval, for prohibiting same-sex marriage:

discrimination against same-sex couples: (1) encouraging responsible procreation and child-rearing; (2) steering naturally procreative relationships into stable unions; (3) promoting "the ideal that children be raised by both a mother and a father in a stable family unit;" and (4) avoiding a redefinition of marriage that would "necessarily change the institution and could have serious unintended consequences." (Smith's Cross. Mot. for Summ. J. 38.) In support of these justifications, Smith has provided twenty-five exhibits consisting primarily of articles and scholarly writings on marriage, child-rearing, and homosexuality, ranging in date from the early twentieth century to 2008, all of which this Court has carefully reviewed.

### i. Encouraging Responsible Procreation/Steering Naturally Procreative Couples to Marriage[39]

Smith argues that "through the institution of marriage, societies seek to increase the likelihood that children will be born and raised in stable and enduring family units by both the mothers and fathers who brought them into this world." (Smith's Resp. to Pls.' Mot. for Summ. J. 27-28.) For purposes of its analysis, the Court accepts that Oklahoma has a legitimate interest in encouraging "responsible procreation," (*i.e.*, procreation within marriage), and in steering "naturally procreative" relationships into marriage, in order to reduce the number of children born out of wedlock and reduce economic burdens on the State.

---

> Texas cannot assert any legitimate state interest here, such as national security or preserving the traditional institution of marriage. Unlike the moral disapproval of same-sex relations – the asserted state interest in this case – other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.

*Lawrence*, 539 U.S. at 585 (O'Connor, J. concurring). However, she did not explain or list what these "other reasons" may be, and the Court has found none present in this case.

[39] Due to their similarity, the Court addresses the first and second justifications together.

However, Part A is not rationally related to these state interests for four reasons.  First, the wealth of scholarly articles in this section of Smith's brief, which range from William Blackstone to John Locke, simply demonstrate that state-recognized marriages developed in part as a means of encouraging and incentivizing procreation within marriage.  *See, e.g.*, John Locke, *The Second Treatise on Civil Government, On Politics and Education*, at 113-14 (1947) ("For the end of conjugation between male and female, being not barely procreation, but the continuation of the species, this conjugation betwixt male and female ought to last, even after procreation, so long as is necessary to the nourishment and support of the young ones.").  (Smith's Cross Mot. for Summ. J. Ex. 5 to Ex. B.)  These articles do not provide what is necessary in an equal protection case – that is, a link between the legal classification *now* being drawn by Part A against same-sex couples and a historical state objective of encouraging  procreation to occur within marriage.  Traditional exclusion of the disadvantaged group from state-sanctioned marriage does not itself evidence a rational link to the identified goal of promoting responsible procreation within marriage.  *See Heller v. Doe*, 509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept does not give it immunity from attack for lacking rational basis."); *Williams v. Illinois*, 399 U.S. 235, 239 (1970) ("Neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack."); *Loving v. Virginia*, 388 U.S. 1, 11-12 (1967) (striking down Virginia's miscegenation statute as violation of equal protection despite state's historical practice of prohibiting interracial marriage).

During oral arguments in *Hollingsworth*, Justice Scalia asked Mr. Theodore Olson, counsel for the opponents of Proposition 8, when it became unconstitutional  "to exclude homosexual couples from marriage." Tr. of Oral Argument 37-38 (March 26, 2013), *Hollingsworth v. Perry*, 133

57

S. Ct. 2652 (2013).  Mr. Olson responded with the rhetorical question of when did it become unconstitutional "to prohibit interracial marriage" or "assign children to separate schools."  *Id.* at 38.  As demonstrated by Mr. Olson's response, the mere fact that an exclusion has occurred in the past (without constitutional problem) does not mean that such exclusion is constitutional when challenged at a particular moment in history.  This Court has an obligation to consider whether an exclusion, although historical, violates the constitutional rights of Oklahoma citizens.

Second, there is no rational link between excluding same-sex couples from marriage and the goals of encouraging "responsible procreation" among the "naturally procreative" and/or steering the "naturally procreative" toward marriage.  Civil marriage in Oklahoma does not have any procreative prerequisites.  *See supra* Part VI(C); *see also Gill*, 699 F. Supp. 2d at 389 ("[T]he ability to procreate is not now, nor has it ever been, a precondition to marriage in any state in the country.").  Permitting same-sex couples to receive a marriage license does not harm, erode, or somehow water-down the "procreative" origins of the marriage institution, any more than marriages of couples who cannot "naturally procreate" or do not ever wish to "naturally procreate."  Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included.[40]

Third, Part A's failure to impose the classification on other similarly situated groups (here, other non-procreative couples) can be probative of a lack of a rational basis.  *See City of Cleburne*, 473 U.S. at 448 (finding that requiring special use permit for mentally handicapped occupants of a

---

[40]  If Smith's unarticulated but underlying argument is that opposite-sex couples are more likely to forego marriage because permitting same-sex couples erodes spiritual and religious aspects of marriage, this devolves again to legislation driven by moral disapproval and not legitimate state interests.

home, but not for other potential occupants, was probative of a lack of rationality); *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001) (explaining *Cleburne* as reasoning that "the city's purported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects"). As in *Cleburne*, the purported justification simply "makes no sense" in light of how Oklahoma treats other non-procreative couples desiring to marry. *See Varnum v. Brien*, 763 N.W.2d 862, 884 (Iowa 2009) (applying Iowa Constitution) (concluding that same-sex couples were, for purposes of state's interest in regulating marriage, similarly situated to opposite-sex couples despite their inability to "naturally procreate"); *Goodridge*, 798 N.E.2d at 962 (applying Massachusetts Constitution) ("The 'marriage is procreation' argument singles out the one unbridgeable difference between same-sex and opposite-sex couples, and transforms that difference into the essence of legal marriage."). This asserted justification also "makes no sense" because a same-sex couple's inability to "naturally procreate" is not a biological distinction of critical importance, in relation to the articulated goal of avoiding children being born out of wedlock. The reality is that same-sex couples, while not able to "naturally procreate," can and do have children by other means. As of the 2010 United States Census, there were 1,280 same-sex "households" in Oklahoma who reported as having "their own children under 18 years of age residing in their household." United States Census 2010 and 2010 American Community Survey, Same-Sex Unmarried Partner or Spouse Households by Sex of Householder by Presence of Own Children, *available at* http://www.census.gov/hhes/samesex/files/supp-table-AFF.xls. If a same-sex couple is capable of having a child with or without a marriage relationship, and the articulated state goal is to reduce children born outside of a marital relationship, the challenged exclusion hinders rather than promotes that goal.

Finally, the Court rejects Smith's "lack of interest" argument. Perhaps recognizing that excluding same-sex couples does not promote the asserted justifications in any rational manner, Smith argues that it is rational to exclude same-sex couples from marriage simply because the State has no real interest in them:

> Even though some same-sex couples do raise children, they cannot create them in the same way opposite-sex couples do – as the often unintended result of casual sexual behavior. As a result, same-sex relationships simply do not pose the same risk of irresponsible procreation that opposite-sex relationships do. . . . Sexual relationships between individuals of the same sex neither advance nor threaten society's interest in responsible procreation in the same manner, or to the same degree, that sexual relationships between men and women do.

(Smith's Cross Mot. for Summ. J. 34.) This "lack of interest" argument is ironic, given the history surrounding Part A's passage. *See supra* Part VI(D)(1). Nonetheless, the Court has considered whether it applies to this case.

In *Johnson v. Robison*, 415 U.S. 361, 383 (1974), the Supreme Court stated that when "inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and non-beneficiaries is invidiously discriminatory." In *Johnson*, the Court held that exclusion of conscientious objectors from veterans' educational benefits was rational, in part, because the benefits would not incentivize service for that class. *See id.* at 382-83. The classification here is readily distinguishable. Assuming a state can rationally exclude citizens from marital benefits due to those citizens' inability to "naturally procreate," the state's exclusion of only same-sex couples in this case is so grossly underinclusive that it is irrational and arbitrary. In *Johnson*, the "carrot" of educational benefits could never actually incentivize military service for the excluded group due to their religious beliefs. In contrast here, the "carrot" of marriage is equally attractive to procreative

and non-procreative couples, is extended to most non-procreative couples, but is withheld from just one type of non-procreative couple. Same-sex couples are being subjected to a "naturally procreative" requirement to which no other Oklahoma citizens are subjected, including the infertile, the elderly, and those who simply do not wish to ever procreate. Rationality review has a limit, and this well exceeds it.

### ii. Promoting the "Optimal" Child-Rearing Environment

Smith also argues that excluding same-sex couples is rationally related to the goal of "promoting" the "ideal" family unit. Smith defines this "ideal" in several different ways throughout the brief, including: (1) "'a family headed by two biological parents in a low-conflict marriage" because "benefits flow in substantial part from the biological connection shared by a child with both mother and father,'" (Smith's Cross Mot. for Summ J. 35 (quoting Kristin Anderson Moore, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?*, Child Trends Research Brief (June 2002), Ex. 19 to Ex. B)); (2) a family unit where children are being "raised by both a mother and a father in a stable family unit;" (*id.*); and (3) a family unit with "'gender-differentiated parenting'" because "'the contribution of fathers to child-rearing is unique and irreplaceable;'" (*id.* 36 (quoting David Popenoe, *Life Without Father,* at 146 (1996), Ex. 23 to Ex. B)).

The Court assumes, for purposes of this motion for summary judgment only, that (1) the "ideal" environment for children must include opposite-sex, married, biological parents, and (2) that "promoting" this ideal is a legitimate state interest.[41] Again, however, the question remains whether

---

[41]  The Court suspects that many adoptive parents would challenge this defined "ideal," and that many "non-ideal" families would question this paternalistic state goal of steering their private choices into one particular model of child-rearing. The Court also notes that same-sex couples are physically capable of satisfying many of the descriptors of the "ideal" environment

exclusion of same-sex couples promotes this interest, or is simply a guise for singling out same-sex couples for different treatment due to "moral disapproval" of a same-sex household with children. Smith has not articulated, and the Court cannot discern, a single way that excluding same-sex couples from marriage will "promote" this "ideal" child-rearing environment. Exclusion from marriage does not make it more likely that a same-sex couple desiring children, or already raising children together, will change course and marry an opposite-sex partner (thereby providing the "ideal" child-rearing environment). *See Mass. v. Dept. of Health and Human Svcs.*, 682 F.3d 1, 14-15 (1st Cir. 2012) (addressing Section 3 of DOMA) ("Certainly, the denial [of marital benefits] will not affect the gender choices of those seeking marriage.").[42]  It is more likely that any potential or existing child will be raised by the same-sex couple without any state-provided marital benefits and without being able to "understand the integrity and closeness of their own family and its concord with other families in their community." *Windsor*, 133 S. Ct. at 2694 (explaining that DOMA "humiliate[d] thousands of children now being raised by same-sex couples" and brought "financial harm to children of same-sex couples"); *see also Gill*, 699 F. Supp. 2d at 389 (concluding that Section 3 of DOMA did nothing to help children of opposite-sex parents but prevented children of same-sex couples from enjoying advantages flowing from a stable family structure); *Goodridge*,

---

explained in Smith's cited literature – namely, a stable, low-conflict, non-violent, loving, and nurturing environment.

   [42]  The Bishop couple denies that their exclusion from marriage makes it more likely they would marry a member of the opposite sex. (*See* Bishop Couple Aff. ¶ 14 (explaining that marrying someone of the opposite sex would, in their opinion, be "emotionally unhealthy and mentally damaging" and that, more importantly, they have already identified the "companion [they] have chosen" to marry and established a long-standing relationship with them), Ex. 1 to Pls.' Mot. for Summ. J.)

798 N.E.2d at 335 (employing same reasoning in conducting rationality review of state policy prohibiting same-sex marriages).

In addition, Smith has not explained, and the Court cannot discern from any of Smith's cited materials, how exclusion of same-sex couples from marriage makes it more likely that opposite-sex marriages will stay in tact (thereby remaining "optimal" child-rearing environments). Excluding same-sex couples from marriage has done little to keep Oklahoma families together thus far, as Oklahoma consistently has one of the highest divorce rates in the country. *See* Table 133, Marriages and Divorces – Number and Rate by State: 1990-2009, *available at* www.census.gov/compendia/ statab/2012/tables/12s0133.pdf (showing Oklahoma as ranking sixth in 2009 for divorce rates). The Court concludes that denial of same-sex couples from marriage "does nothing to promote stability in heterosexual parenting." *See Gill*, 699 F. Supp. 2d at 389 (analyzing rationality of Section 3 of DOMA).

After presenting the empirical support espousing the benefits of this "ideal" family unit, Smith offers a one-sentence, conclusory statement that is supposed to provide the link between the empirical data and the exclusion: "It is rational, then, for Oklahoma to give 'special recognition' to relationships that are designed to provide children the optimal environment of both a mother and a father." (Smith's Cross Mot. for Summ. 38.) Whether they are "designed to" or not, common sense dictates that many opposite-sex couples never actually do provide this optimal child-rearing environment, due to drug use, abuse, or, more commonly, divorce. As with "natural procreative" abilities, Smith does not condition any other couple's receipt of a marriage license on their willingness or ability to provide an "optimal" child-rearing environment for any potential or existing children. While there need not be a good fit between the exclusion of same-sex couples from

marriage and the promotion of this "ideal" family unit, there does need to be some reason for excluding the class. Such a reason is lacking here.

### iii.       Negative Impact on Marriage

Smith's final argument is that "it is rational for Oklahoma voters to believe that fundamentally redefining marriage could have a severe and negative impact on the institution as a whole." (Smith's Cross Mot. for Summ. J. 38.) This argument is best summarized in an article entitled *Marriage and the Public Good: Ten Principles*. (Witherspoon Institute, *Marriage and the Public Good: Ten Principles* (2008), Smith's Cross Mot. for Summ. J., Ex. 28 to Ex. B.) After discussing the plethora of benefits that marriage offers adults and children, the article then explains how same-sex marriage is one of four "threats" to the institution (along with divorce, illegitimacy, and cohabitation):

> [T]here remain even deeper concerns about the institutional consequences of same-sex marriage for marriage itself. Same-sex marriage would further undercut the idea that procreation is intrinsically connected to marriage. It would undermine the idea that children need both a mother and a father, further weakening the societal norm that men should take responsibility for the children they beget. Finally, same-sex marriage would likely corrode marital norms of sexual fidelity, since gay marriage advocates and gay couples tend to downplay the importance of sexual fidelity in their definition of marriage.

(*Id.* at 18-19.) *See also, e.g., Sandoval*, 911 F. Supp. 2d at 1015-16 (finding Nevada's same-sex marriage bans to pass rationality review because "extending" marriage to same-sex couples could "conceivably" lead to an "increased percentage of out-of-wedlock children, single-parent families,

difficulties in property disputes . . ., or other unforeseen consequences");[43] *Jackson*, 884 F. Supp. 2d at 1112-15 (same).[44]

The "negative impact" argument is impermissibly tied to moral disapproval of same-sex couples as a class of Oklahoma citizens.  All of these perceived "threats" are to one view of the marriage institution – a view that is bound up in procreation, one morally "ideal" parenting model, and sexual fidelity.  However, civil marriage in Oklahoma is not an institution with "moral" requirements for any other group of citizens.  *See supra* Part VI(C).  Smith does not ask a couple if they intend to be faithful to one another, if they intend to procreate, or if they would someday consider divorce, thereby potentially leaving their child to be raised in a single-parent home.  With respect to marriage licenses, the State has already opened the courthouse doors to opposite-sex couples without any moral, procreative, parenting, or fidelity requirements.  Exclusion of just one class of citizens from receiving a marriage license based upon the perceived "threat" they pose to the marital institution is, at bottom, an arbitrary exclusion based upon the majority's disapproval of the defined class.  It is also insulting to same-sex couples, who are human beings capable of forming loving, committed, enduring relationships.  "'Preserving the traditional institution of marriage,'" which is the gist of Smith's final asserted justification, "is just a kinder way of describing the State's moral disapproval of same-sex couples." *Lawrence*, 539 U.S. at 602 (Scalia, J., dissenting).

---

[43] The *Sandoval* court reasoned in part that "civil marriage is at least partially a public activity, and preventing 'abuse of an institution the law protects'" is a valid state interest. *Sandoval,* 911 F. Supp. 2d at 1014.  As demonstrated above, same-sex couples do not possess any characteristic indicating they can or will "abuse" the institution of marriage any more or any differently than other included groups.

[44] Both *Jackson* and *Sandoval* were decided before *Windsor*.

Having considered all four proffered justifications for Part A, the Court concludes that exclusion of same-sex couples is "so attenuated" from any of these goals that the exclusion cannot survive rational-basis review. *See City of Cleburne*, 473 U.S. at 447 (explaining that a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"); *Vigil*, 666 F.3d at 684 (equal protection review "seeks to ensure" that "those who 'appear similarly situated' are not treated differently without, at the very least, 'a rational reason for the difference'"); *Price-Cornelison*, 524 F.3d at 1114 ("[W]e cannot discern on this record, a rational reason to provide less protection to lesbian victims of domestic violence than to heterosexual domestic violence victims.").

### E.    Equal Protection Conclusion

The Supreme Court has not expressly reached the issue of whether state laws prohibiting same-sex marriage violate the U.S. Constitution.  However, Supreme Court law now prohibits states from passing laws that are born of animosity against homosexuals, extends constitutional protection to the moral and sexual choices of homosexuals, and prohibits the federal government from treating opposite-sex marriages and same-sex marriages differently.  There is no precise legal label for what has occurred in Supreme Court jurisprudence beginning with *Romer* in 1996 and culminating in *Windsor* in 2013, but this Court knows a rhetorical shift when it sees one.

Against this backdrop, the Court's task is to determine whether Part A of the Oklahoma Constitutional Amendment deprives a class of Oklahoma citizens – namely, same-sex couples desiring an Oklahoma marriage license – of equal protection of the law.  Applying deferential rationality review, the Court searched for a rational link between exclusion of this class from civil marriage and promotion of a legitimate governmental objective.  Finding none, the Court's

rationality review reveals Part A as an arbitrary, irrational exclusion of just one class of Oklahoma citizens from a governmental benefit.

Equal protection is at the very heart of our legal system and central to our consent to be governed. It is not a scarce commodity to be meted out begrudgingly or in short portions. Therefore, the majority view in Oklahoma must give way to individual constitutional rights. The Bishop couple has been in a loving, committed relationships for many years. They own property together, wish to retire together, wish to make medical decisions for one another, and wish to be recognized as a married couple with all its attendant rights and responsibilities. Part A of the Oklahoma Constitutional Amendment excludes the Bishop couple, and all otherwise eligible same-sex couples, from this privilege without a legally sufficient justification.

## VII.    Injunctive Relief and Rulings on Pending Motions

The Court declares that Part A of the Oklahoma Constitutional Amendment violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by precluding same-sex couples from receiving an Oklahoma marriage license. The Court permanently enjoins enforcement of Part A against same-sex couples seeking a marriage license. In accordance with the U.S. Supreme Court's issuance of a stay in a nearly identical case on appeal from the District Court of Utah to the Tenth Circuit Court of Appeals, *see Herbert v. Kitchen*, U.S. Supreme Court Order in Pending Case 13A687 (Jan. 6, 2014), the Court stays execution of this injunction pending the final disposition of any appeal to the Tenth Circuit Court of Appeals.

Plaintiffs' Motion for Summary Judgment (Doc. 197) is GRANTED as to Part A of the Oklahoma Constitutional Amendment and otherwise DENIED. Defendant Sally Howe Smith's Cross Motion for Summary Judgment (Doc. 216) is DENIED as to Part A of the Oklahoma

Constitutional Amendment, and GRANTED as to Part B based on the Barton couple's lack of standing. The Barton couple's challenge to Part B is dismissed for lack of standing.

The Barton couple's Motion for Entry of Final Judgment (Doc. 257) is DENIED, and their challenge to Section 3 of DOMA is dismissed based upon constitutional mootness. BLAG's motion to withdraw as an intervening party (Doc. 263) is GRANTED, and BLAG's pending motion for summary judgment (Doc. 214) is DENIED as moot. The Motion to Dismiss by United States of America and Eric H. Holder, Jr., Attorney General (Doc. 211) is GRANTED, and the Barton couple's challenge to Section 2 of DOMA is dismissed for lack of standing.

**IT IS SO ORDERED** this 14th day of January, 2014.


**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**