IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARY BISHOP,                                   )
SHARON BALDWIN,                                )
SUSAN BARTON, and                              )
GAY PHILLIPS,                                  )
                                               )
            Plaintiffs,                        )
                                               )
v.                                             )            No. 04-CV-848-TCK-TLW
                                               )
UNITED STATES OF AMERICA,                      )
ex rel. ERIC H. HOLDER, JR., in his            )
official capacity as Attorney General          )
of the United States of America; and           )
SALLY HOWE SMITH, in her official              )
capacity as Court Clerk for Tulsa County,      )
State of Oklahoma,                             )
                                               )
            Defendants,                        )
                                               )
BIPARTISAN LEGAL ADVISORY                      )
GROUP OF THE U.S. HOUSE OF                     )
REPRESENTATIVES,                               )
                                               )
            Intervenor-Defendant.              )

## ORDER

The Court has made seven typographical corrections to the Opinion and Order dated January 14, 2014 (Doc. 272). Specifically, the Court (1) inserted a period after the word "sex" in footnote 2 on page 3; (2) changed "Baron" to "Barton" in footnote 13 on page 14; (3) removed an extra "of" on page 38; (4) changed a pinpoint citation to *Vigil* from "686" to "687" on page 52; (5) changed "proponents" to "opponents" on page 57; (6) removed "not" from the parenthetical following *Gill* on page 62; and (7) changed a pinpoint citation to *Vigil* from "685" to "684" and corrected the quotation in the parenthetical following *Vigil* on page 66.

The seven corrected pages are attached to this Order, and the Court Clerk is ordered to replace these pages in the Opinion and Order dated January 14, 2014.

**SO ORDERED** this 17th day of January, 2014.

**TERENCE KERN**
**United States District Judge**

**B.     Oklahoma Constitutional Amendment**

On November 2, 2004, Oklahoma voters approved State Question No. 711 ("SQ 711"),

which was implemented as article 2, section 35 of the Oklahoma Constitution.[1]   The Oklahoma

Constitutional Amendment provides:

> "Marriage" Defined – Construction of Law and Constitution – Recognition of Out-
> of-State Marriages - Penalty
>
> A.  Marriage in this state shall consist only of the union of one man and one woman.
> Neither this Constitution nor any other provision of law shall be construed to require
> that marital status or the legal incidents thereof be conferred upon unmarried couples
> or groups.[2]
>
> B.  A marriage between persons of the same gender performed in another state shall
> not be recognized as valid and binding in this state as of the date of the marriage.[3]
>
> C.  Any person knowingly issuing a marriage license in violation of this section shall
> be guilty of a misdemeanor.

Okla. Const. art. 2, § 35 (footnotes added).  Part A of the Oklahoma Constitutional Amendment

("Part A") is the definitional provision, which provides that marriage in Oklahoma "shall consist

only of the union of one man and one woman."  Part B of the Oklahoma Constitutional Amendment

("Part B") is the "non-recognition" provision, which provides that same-sex marriages performed

---

[1]   SQ 711 passed by a vote of 1,075,216 to 347,303.  (*See* Smith's Cross Mot. for Summ.
J., Ex. 3.)

[2]   An Oklahoma statute also prevents same-sex couples from marrying.  Okla. Stat. tit.
43, § 3(A) ("Any unmarried person who is at least eighteen (18) years of age and not otherwise
disqualified is capable of contracting and consenting to marriage with a person *of the opposite
sex.*") (emphasis added).  This statute is not challenged.

[3]   An Oklahoma statute also prevents recognition of same-sex marriages.  Okla. Stat. tit.
43, § 3.1 ("A marriage between persons of the same gender performed in another state shall not
be recognized as valid and binding in this state as of the date of the marriage.").  This statute is
not challenged.

attack was made at the Rule 12(b)(6) stage, the Court "accept[s] the allegations in the [Amended Complaint] as true for purposes of [its] standing analysis." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).  Further, the Court must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (internal citation omitted).

The Court construes the Amended Complaint as alleging three injuries flowing from Section 2.  First, the Barton couple alleges the injury of being unable to obtain recognition of their California marriage in Oklahoma ("non-recognition").  (*See* Am. Compl. ¶ 20.)  Second, they allege the injury of unequal treatment, flowing from the United States' erection of Section 2 as a barrier to obtaining the benefit of recognition of their California marriage in Oklahoma ("unequal treatment").  (*See id.* ¶ 12; *see also* Pls.' Resp. to Mot. to Dismiss 12 (arguing that "[Section 2] operates as such a barrier in that it officially sanctions the denial of equal treatment of Plaintiffs' marriage and the attendant recognition/status that springs from such recognition").)  Finally, they allege the injury of stigma and humiliation.  (*See* Am. Compl. ¶ 22; *see also* Pls.' Resp. to Mot. to Dismiss 11-12 ("[Plaintiffs] have a second-class marriage in the eyes of friends, neighbors, colleagues, and the United States of America.").)

### 1.    Non-Recognition

The Court concludes that neither Section 2, nor the U.S. Attorney General's enforcement thereof, plays a sufficient "causation" role leading to the Barton couple's alleged injury of non-recognition of their California marriage in Oklahoma.[13]  Section 2 is an entirely permissive federal

---

[13]  The United States also argues that the Barton couple has not suffered an injury in fact based upon their failure to "have actually sought and been denied" recognition of their California marriage in Oklahoma.  (*See* United States' Mot. to Dismiss 5.)  For purposes of this motion, the Court assumes without deciding that the Barton couple's alleged injuries constitute injuries in

couples.  These two principles are not contradictory, but they happen to help different sides of the same-sex marriage debate.

### C.     Civil Marriage in Oklahoma

Before reaching its equal protection analysis, some preliminary discussion of civil marriage in Oklahoma is necessary.  In order to enter into a marital contract, *see* Okla. Stat. tit. 43, § 1 (explaining that marriage is a "personal relation arising out of a civil contract"), a couple must first obtain a marriage license from the "judge or clerk of the district court, of some county in this state, authorizing the marriage between the persons named in such license."  Okla. Stat. tit. 43, § 4.  In order to qualify for a marriage license, a couple must have the following characteristics: (1) the parties must be "legally competent of contracting," *id.* § 1; (2) each person must be "unmarried," *see id.* § 3(A); (3) the couple must consist of "one man and one woman," *see* Okla. Const. art. 2, § 35(A); *see also* Okla. Stat. tit. 43, § 3(A) (indicating that marital contract must be entered "with a person of the opposite sex"); (4) both parties must be eighteen years of age, *see* Okla. Stat. tit. 43, § 3(A);[25] and (5) the couple must not be related to one another in certain ways, *see id.* § 2.[26]  But for the Bishop couple's status as a same-sex couple, they satisfy the other eligibility criteria for obtaining a marriage license.

The process of obtaining a marriage license requires the couple to "submit an application in writing signed and sworn to in person before the clerk of the district court by both of the parties

---

[25]  Oklahoma permits persons between the ages of sixteen and eighteen to marry with parental consent, *see id.* § 3(B)(1)(a)-(f), and persons under sixteen to marry if authorized by the court in very limited circumstances, *see id.* § 3(B)(2).

[26]  Marriages between "ancestors and descendants of any degree, of a stepfather with a stepdaughter, stepmother with stepson, between uncles and nieces, aunts and nephews, except in cases where such relationship is only by marriage, between brothers and sisters of the half as well as the whole blood, [or] first cousins" are prohibited.  Okla. Stat. tit. 43, § 2.

homosexual bore a "rational relation to some legitimate end").  In conducting its review, the Court must not only consider the actual purpose of the law but also whether there are any other justifications that could "conceivably" provide a rational reason for its passage.  *See Schanzenbach v. Town of Opal, Wyo.*, 706 F.3d 1269, 1276 (10th Cir. 2013) (explaining that a proferred justification for a law need not have actually motivated the legislature).  Further, "there need not be a perfect fit between purpose and achievement for a law to pass constitutional muster."  *Id.*  There is no difference in the rationality standard where the law in question is a state constitutional amendment enacted by a vote of citizens.  *See Romer*, 517 U.S. at 631 (concluding that Colorado constitutional amendment did not bear a "rational relation to a legitimate end").

The Court's ultimate task, even under rationality review, is to determine "whether there is some ground of difference having a fair and substantial relation to at least one of the stated purposes justifying the different treatment" between the included class and the excluded class.  *Johnson v. Robison*, 415 U.S. 361, 376 (1974); *see also Vigil*, 666 F.3d at 687 ("In any case, though, and whatever the applicable standard of review, the aim is always to ensure that, while persons in dissimilar situations may be treated differently, the law treats like alike.").  A state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985). "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [a court] ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."  *Romer*, 517 U.S. at 634-35.

However, Part A is not rationally related to these state interests for four reasons.  First, the wealth of scholarly articles in this section of Smith's brief, which range from William Blackstone to John Locke, simply demonstrate that state-recognized marriages developed in part as a means of encouraging and incentivizing procreation within marriage.  *See, e.g.*, John Locke, *The Second Treatise on Civil Government, On Politics and Education*, at 113-14 (1947) ("For the end of conjugation between male and female, being not barely procreation, but the continuation of the species, this conjugation betwixt male and female ought to last, even after procreation, so long as is necessary to the nourishment and support of the young ones.").  (Smith's Cross Mot. for Summ. J. Ex. 5 to Ex. B.)  These articles do not provide what is necessary in an equal protection case – that is, a link between the legal classification *now* being drawn by Part A against same-sex couples and a historical state objective of encouraging  procreation to occur within marriage.  Traditional exclusion of the disadvantaged group from state-sanctioned marriage does not itself evidence a rational link to the identified goal of promoting responsible procreation within marriage.  *See Heller v. Doe*, 509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept does not give it immunity from attack for lacking rational basis."); *Williams v. Illinois*, 399 U.S. 235, 239 (1970) ("Neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack."); *Loving v. Virginia*, 388 U.S. 1, 11-12 (1967) (striking down Virginia's miscegenation statute as violation of equal protection despite state's historical practice of prohibiting interracial marriage).

During oral arguments in *Hollingsworth*, Justice Scalia asked Mr. Theodore Olson, counsel for the opponents of Proposition 8, when it became unconstitutional  "to exclude homosexual couples from marriage." Tr. of Oral Argument 37-38 (March 26, 2013), *Hollingsworth v. Perry*, 133

57

exclusion of same-sex couples promotes this interest, or is simply a guise for singling out same-sex couples for different treatment due to "moral disapproval" of a same-sex household with children. Smith has not articulated, and the Court cannot discern, a single way that excluding same-sex couples from marriage will "promote" this "ideal" child-rearing environment. Exclusion from marriage does not make it more likely that a same-sex couple desiring children, or already raising children together, will change course and marry an opposite-sex partner (thereby providing the "ideal" child-rearing environment). *See Mass. v. Dept. of Health and Human Svcs.*, 682 F.3d 1, 14-15 (1st Cir. 2012) (addressing Section 3 of DOMA) ("Certainly, the denial [of marital benefits] will not affect the gender choices of those seeking marriage.").[42]  It is more likely that any potential or existing child will be raised by the same-sex couple without any state-provided marital benefits and without being able to "understand the integrity and closeness of their own family and its concord with other families in their community." *Windsor*, 133 S. Ct. at 2694 (explaining that DOMA "humiliate[d] thousands of children now being raised by same-sex couples" and brought "financial harm to children of same-sex couples"); *see also Gill*, 699 F. Supp. 2d at 389 (concluding that Section 3 of DOMA did nothing to help children of opposite-sex parents but prevented children of same-sex couples from enjoying advantages flowing from a stable family structure); *Goodridge*,

---

explained in Smith's cited literature – namely, a stable, low-conflict, non-violent, loving, and nurturing environment.

   [42]  The Bishop couple denies that their exclusion from marriage makes it more likely they would marry a member of the opposite sex.  (*See* Bishop Couple Aff. ¶ 14 (explaining that marrying someone of the opposite sex would, in their opinion, be "emotionally unhealthy and mentally damaging" and that, more importantly, they have already identified the "companion [they] have chosen" to marry and established a long-standing relationship with them), Ex. 1 to Pls.' Mot. for Summ. J.)

Having considered all four preferred justifications for Part A, the Court concludes that exclusion of same-sex couples is "so attenuated" from any of these goals that the exclusion cannot survive rational-basis review. *See City of Cleburne*, 473 U.S. at 447 (explaining that a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"); *Vigil*, 666 F.3d at 684 (equal protection review "seeks to ensure" that "those who 'appear similarly situated' are not treated differently without, at the very least, 'a rational reason for the difference'"); *Price-Cornelison*, 524 F.3d at 1114 ("[W]e cannot discern on this record, a rational reason to provide less protection to lesbian victims of domestic violence than to heterosexual domestic violence victims.").

### E.       Equal Protection Conclusion

The Supreme Court has not expressly reached the issue of whether state laws prohibiting same-sex marriage violate the U.S. Constitution. However, Supreme Court law now prohibits states from passing laws that are born of animosity against homosexuals, extends constitutional protection to the moral and sexual choices of homosexuals, and prohibits the federal government from treating opposite-sex marriages and same-sex marriages differently. There is no precise legal label for what has occurred in Supreme Court jurisprudence beginning with *Romer* in 1996 and culminating in *Windsor* in 2013, but this Court knows a rhetorical shift when it sees one.

Against this backdrop, the Court's task is to determine whether Part A of the Oklahoma Constitutional Amendment deprives a class of Oklahoma citizens – namely, same-sex couples desiring an Oklahoma marriage license – of equal protection of the law. Applying deferential rationality review, the Court searched for a rational link between exclusion of this class from civil marriage and promotion of a legitimate governmental objective. Finding none, the Court's